(34 South. 41.)

No. 14,023.

## BROWN v. CITY OF BATON ROUGE.*

(Nov. 17, 1902.)

MUNICIPAL IMPROVEMENTS—CONTRACT FOR SEWER—ABANDONMENT BY CONTRACT-OR—RIGHTS OF CITY ENGINEER.

1. Where the parties to a contract for constructing a system of sewerage, anticipating possible cavings of banks and errors in grades, agree that, in the event of their occurrence, the resulting rights and obligations of the parties shall be referred to and adjusted by the chief engineer, and the expenditures and losses shall be charged to the party in fault, or as provided for by the provisions of the contract, the contract remaining in force, the contractor is not justified in abandoning the work, throwing up the contract, and ignoring the method of adjustment fixed by the contract.

2. Where, during the execution of a contract for the construction of a system of sewerage for the city, the chief engineer has reason to believe that a portion of pipe laid and backfilled has been placed on a wrong grade, and under the terms of the contract the contractor is under obligation to obey the orders of the engineer as to the work imperfectly constructed, the engineer has the authority, on the refusal of the contractor, to uncover the pipe to have the same done by other parties under his supervision. Such action is not an ousting of the contractor from the work and the taking in charge of the same by the city.

3. The contractor for the construction of a system of sewerage for a city will not be permitted, by abandoning the work at a selected stage, to place himself in a better, and the city, without fault on its part, in a worse, position than the parties would have occupied had the contract been fully executed.

(Syllabus by the Court.)

Appeal from Judicial District Court, Parish of East Baton Rouge; H. F. Brunot, Judge.

Action by Linus W. Brown against the city of Baton Rouge. Judgment for defendant, and plaintiff appeals. Affirmed.

Charles C. Bird and E. A. O'Sullivan, for appellant. T. Jones Cross, City Atty., for appellee.

NICHOLLS, C. J. On the 14th of August, 1900, the plaintiff entered into a contract with the city of Baton Rouge, whereby he agreed for the consideration stated therein to furnish at his own cost and expense all the necessary materials and labor (except as was specially excepted in the contract), and to excavate for, and build in a good firm and substantial manner, the sewers indicated in a plan then on file in the office of the engineer in charge of sewerage, and the connections and appurtenances of every kind complete, of the dimensions, in the manner, and under the conditions specified; and further agreed that the engineer in charge of the work should inspect or cause to be inspected the materials to be furnished and the work to be done under the contract, and to see that the same should correspond with the specifications attached thereto.

He agreed to receive as full compensation for furnishing all materials, labor, and tools used in building and constructing, excavating, and back-filling, and in all respects completing the work and appurtenances in the manner and under the conditions specified, and as full compensation for all loss or damage arising out of the nature of the work,

---

*Rehearing denied March 30, 1903.

or from the action of the elements, or from any unforeseen obstructions and difficulties which might arise or be encountered in the prosecution of the same, and for all expenses incurred by and in consequence of the suspension or discontinuance of the work, and for well and faithfully completing the same, and the whole thereof, according to the specifications and requirements of the engineer under them, certain prices specified and fixed in the contract. The plaintiff commenced work under the contract in August, 1900, but did not complete it. On the 25th of October he dismissed his force of laborers, removed the tools and implements of construction, and abandoned the work, and on the 10th of November instituted the present action against the city of Baton Rouge. The action of the plaintiff in abandoning work was preceded by considerable correspondence between himself and Col. Hartford, the engineer in charge, and between himself and the mayor.

On October 19th he wrote to the latter, saying "he had the honor to address him concerning the hardships he had encountered and the serious losses he had sustained through his representatives [the representatives of the city] in connection with the work he was executing for him [the city]; that he did so with reluctance, but that he felt the interest of all concerned was materially affected; that he attached a statement, which partially contained the hardships he had encountered, and which were causing not only a direct loss to him, but materially affecting the character and value of the work. He requested that the mayor and members of the board of public works would give this matter their earliest consideration, with a view of reaching arrangements whereby the recurrence of the errors would be avoided, and a just, equitable, and satisfactory remuneration would be accorded him to cover losses he had sustained in consequence thereof."

The statement referred to contained a list of wrong grades which he alleged had been given him at different dates between August 26th and October 15th (both inclusive), and which required him to make alterations carrying with them delays and additional expense.

In this statement he mentioned a communi-

cation from Col. Hartford to himself of date 15th of October, directing him "to restore a certain displaced pipe reported to be below grade," and calling his attention in that connection to article 28 of the specifications governing the work; also to a written communication to him on the same day from Hartford, directing that "no more trenches shall be opened more than 300 feet in advance of pipe laying, and that the work shall be completed as it is carried out."

Also to a direction in writing upon the same day that in tunneling for sewers no more tunneling must be resorted to except under the restrictions named in article 11 in the specifications, and stating that, "where pipe is not laid, and excavation was then in progress, the entire work must be open, cut, and properly braced." He also in this statement complained that he had not been permitted on certain occasions to work on Sunday and at night, and that the result of not having been permitted to do so was the cavings in of the trench, which could have been avoided. In reference to the order given by Col. Hartford on the 15th of October that "the pipe reported displaced should be restored to grade," he said that while he was taking steps looking to the execution of the order, and to ascertaining how the chief engineer desired this done, he was informed that the latter was arranging to do that work himself; that he called upon Col. Hartford, and discussed matters with him, but that during the interview no mention whatever was made by him as to his engaging men and placing them on the work; neither had he received any communication advising that he had any such intention; that on the 16th of October a gang of three men under a foreman had been placed on the work by order of the chief engineer; that this appeared to him to be an unprecedented proceeding, and a violation of contract; that he had not been placed in default, and there was no occasion for so placing him, as he had carried out his contract as thoroughly and intelligently as was possible, and the placing of this foreman and three men upon the work would appear to be the most vicious act possible.

Referring to the direction given to him that no more trenches must be opened more than 300 feet in advance of pipe laying, and that

the work should be completed as it was carried on, he declared it to be an arbitrary ruling on the part of the chief engineer, in that the contractor was governed entirely as to the opening of a trench ahead of pipe laying by the room required to work the gangs employed; that with a gang of 40 men they could not be placed in 300 feet; it would require a longer distance; and he had yet to learn of an instance where the contractor was restricted to this distance, as this was governed entirely by the force he employed; that consequently he could not agree to execute the work with such restrictions.

With reference to the restriction contained in the direction as to tunneling, he declared that this was also a most arbitrary ruling; that he had consulted freely with the chief engineer as to the methods to be adopted in deep cuts, and had been advised that there would be no objection to tunneling; in fact he considered and advised that it was the only method that could be adopted and employed economically in deep cuts, and, further, it was the usual practice; that he would consider the restrictions contained in this communication a violation of the understanding reached between the chief engineer and himself in connection with that matter.

He claimed that, had no changes nor delays been occasioned in the laying of the pipe through the deep cuts on South Boulevard, it would have been kept, as it properly should, directly up to the finished excavation, but that the changes and errors in grade and the refusal to allow the work to progress on nights or on Sundays had necessitated the leaving of these bins and tunnels open entirely too long, and had occasioned the existing condition of caving; that in sewer work, no matter of what magnitude, it must not be restricted as to the time when the work should be done, either as to the hour of the day or night, Sundays or holidays, and any restrictions on the contractor as to the hour of the day or the day of the week that he should execute the work practically rendered impossible any satisfactory sewer completion.

On the 22d. of October the plaintiff wrote another letter to the mayor and board, in which, after referring to this former one of the 19th, and the subject-matter thereof, he said:

"A very thorough consideration of all the facts as now developed in connection with the work leads me to submit to you the only proposition that I can see my way clear to make, and in making these propositions I am actuated by a desire to have your City provided with a properly constructed sewerage system, within a reasonable cost notwithstanding the errors and impediments which had already been made in connection with the work, and also to avoid unnecessary trouble and expense. My contract is legally annulled by the acts of your representatives, but, with a view of providing a satisfactory solution of the matter, and securing greater benefits to all concerned I propose as follows: For the work done to date you to pay me actual cost and 10% and I to proceed with the work under the direction and control and management of Col. Hartford with my force and plant, and push the work to completion as rapidly as possible on a basis of 10% on actual cost of the work.

"2nd. For all work done to date, you to pay me the actual cost and 10% and I to proceed with the work with my organized force and plant and push it to completion as quickly as possible and to have the entire control of the execution of the work including the establishing of all lines and levels, the positive elevations at initial points and scope to be given by Col. Hartford in writing, and I to execute the work accordingly. The cost of the work to be paid for by the City, and I to receive as compensation for my services the difference in cost of the work to be done and the prices contained in my bid for the work. Under which management your City would secure a properly executed system, and the cost would not materially exceed that contemplated. In making this proposition I do not prejudice any of my rights in the matter should the proposition not be accepted. I shall await your pleasure in the matter up to 7 a. m. Tuesday, October 23rd, 1900."

On the 23d of October, the plaintiff wrote another letter to the mayor and board, in which he referred to his former letter of the 19th of October, and its object and purpose. He stated that, the board not having adopted any measures having for their object the amelioration of the hardships or granting him any redress, he had thought it wise to ad-

BROWN v. CITY OF BATON ROUGE.

dress them again on October 22d, and, submitting the fact that their representatives had legally annulled his contract, he submitted two propositions (without prejudice to his rights) for the execution of the work, advising them that he would await their action until 7 a. m., October 23, 1900 (that day); that, the matter being of such moment, prompt and immediate action was necessary, as he could not continue the work under the hardships then existing. He stated he had failed to receive any reply to this communication, and, in accordance with the advices contained in his letter of the 23d, he had withheld his forces from further work, but that he would hold them there until 7 a. m., October 25th, before disbanding them, and extend further opportunities for the board to consider the matter with a view of reaching a satisfactory adjustment; that he reserved all his rights in the premises.

On the 25th of October, the plaintiff wrote another letter to the mayor and board in which he said:

"Your verbal proposition for me to presume work at once and accept such monetary consideration for past loss as may be determined due me by decision of sewerage experts has received my earnest consideration. I cannot entertain the proposition for the reason that I have no guaranty that I would not be subjected to a continuance of the delays and errors in grades and restrictions as to when I shall work, and the placing of men on my work ad libitum—acts not embraced in my contract and under which no work of this character can be executed; and for me to accept your proposition under these circumstances would be prejudicial to all interests involved."

The plaintiff on that day discharged his force and withdrew from the work.

A number of attempts, but without result, were made between that date and the 10th of November looking to an adjustment of the claims advanced by plaintiff, or propositions made by him to resume the work, but under conditions other than those of the contract.

On December 11th the city of Baton Rouge made a contract with Guild & Co. for the consideration, specified therein, to furnish at their cost and expense all the necessary materials and labor (except as specially provided for), and to excavate for and build the sewers indicated in the plan then on file in the office of the engineer of the city of Baton Rouge, and the connections and appurtenances thereof, in the manner and under the conditions specified.

The terms and conditions and specifications of this contract were substantially the same as those which had been made by the city with the plaintiff. The sewers appear to have been completed under this contract.

On the 26th of October—the day after the plaintiff had withdrawn and disbanded his force, as he had stated he would do in his letters prior to that date—Hartford, the chief engineer, had written to him the following communication:

"Under Article 29th of the specifications of your contract with the city of Baton Rouge for the construction of sewers, you are hereby notified that there is unnecessary delay in the prosecution of the work. You are hereby notified and directed to take such necessary measures as will secure satisfactory completion of the work under your contract following explicitly the specifications."

The plaintiff acknowledged, on the 28th of October, receipt of this communication, and in his letter of acknowledgment, among other things, said:

"You no doubt know from the communication which I had the honor to submit to the Board of Public Works under date of October 19th in which I fully set forth my grievances and the hardships I have endured at your hands and the hands of those under you, to say nothing of my verbal complaints to you that no contractor could possibly complete the work or continue it for the most limited time under such circumstances.

"In case of any unnecessary delays in the opinion of the Engineer he shall notify the Contractor in writing to that effect. If the Contractor shall not within five days thereafter take such measures as will in the judgment of the Engineer insure the satisfactory completion of the work, the Engineer under authority from the City may then notify the Contractor to discontinue all work under this contract, and it is hereby agreed that the Contractor is to immediately respect said notice and stop work, and cease to have any right possession of the ground. The Engineer shall thereupon have the power to

place such and so many persons as he may deem advisable by contract or otherwise to complete the work herein described, and to use such materials as he may upon the line of the work or to procure other material for the completion of the same and to charge the expense of said labor and materials to the aforesaid contractor, and the expense so charged shall be deducted and paid by the party of the first part [the city] out of such money as may be then due or at any time thereafter become due to said contractor, under and by virtue of the agreement or any part thereof, and in case such expense is less than the sum which would have been payable under this contract if the same had been completed by the party of the second part [the plaintiff], he shall be entitled to receive the difference, and in case such expense is greater, the party of the second part [the contractor, the plaintiff] shall pay the amount of the excess so due."

The contract between the plaintiff and the city was not "for and in consideration of the price and sum aggregating . forty-five thousand dollars," as alleged in the petition. Forty-five thousand dollars, or so much thereof as might be necessary, was the amount set aside by the city for the construction of a system of sewerage and drainage. The amount to be expended for the system was not to exceed $45,000, but it might be less.

The plaintiff bound himself to complete the work in its entirety under a plan proposed to it by Col. Hartford at certain prices, but the exact amount of the work to be done, and of the material to be furnished, and the exact character of the material furnished to be used were not definitely, but only generally and approximately, fixed therein. These factors being uncertain, the price to be given for the execution of the entire system could not be fixed in round numbers for the whole by anticipation. The work consisting principally of the furnishing and laying of pipes of certain sizes and material in trenches of various depths and widths and refilling the trenches, the contractor agreed to excavate trenches of varying depths and widths, to furnish and lay therein pipes of a particular material and size, and to refill the excavations for certain specified amounts.

The eight-inch clay pipe sewer, laid and complete, 0 to 6 feet deep, per lineal foot, 28 cents; 6 to 8 feet deep, per lineal foot, 30 cents; 8 to 10 feet deep, per lineal foot, 38 cents; and so on down for excavations 20 feet or more in depth, the price increasing at each 2 feet of depth in the same manner.

For 10-inch clay pipe sewer, laid and complete, and other sizes of clay pipe sewer, laid and complete, from 10-inch up to 24-inch clay pipe sewer, laid and complete, different prices per lineal foot, the prices varying and increasing for each increasing size of pipe and each 2 feet in the depth of excavation.

The contract fixed contingently the increased price which was to be paid should cast-iron pipes of different sizes be substituted for the same-sized clay pipes.

The prices for certain substantively described appurtenances of the system—such as manholes, flush tanks, etc., were specifically fixed.

In a letter of October 30th the plaintiff wrote to the mayor and board as follows:

"Appreciating the estranged relations which cannot probably be avoided between your engineer and myself, due to the measures I have been forced to take, and with a view of arranging a satisfactory compromise, and avoid all further trouble and expense, I would submit a proposition whereby you pay me actual cost and 10% on all work I have performed, and the actual cost, with no profit to me on all the materials and tools I have in hand for the work, which, according to the statements annexed, would be as follows:

Actual money on work performed.......... $13,380 15
10% on amount.............................. 1,338 01
Actual cost of materials and tools on hand
    and paid for............................. 1,309 56

Total amount due........................... $16,027 72
Paid by City on account................... 5,450 04

Balance due .............................. $10,577 68

"You to accept my order for payment on materials and tools which are in hand but not paid for—amounting to $6,126.35."

In a later letter he wrote:

"Understanding that it is the desire of the Board in order to amicably settle the matters now before it, and setting aside all other propositions made by me, I submit a definite and fixed sum that I will accept in full settlement. I submit the following:

I have paid out for labor plant and ma-
  terials now in the work and on hand
  and actually paid for by me............... $14,770 51
I have received on account of the work....   5,450 04
                                             ─────────
    Leaving a difference of.................. $ 9,320 47

"This is the actual difference existing, and I am willing to accept this amount losing my profit on same and over two months' work."

In one of the letters written by the plaintiff to the mayor tendering propositions of settlement, the additional 10 per cent. beyond actual cost mentioned therein is referred to as "being to cover the extraordinary expense which the errors of the inspectors forced him to incur."

In their brief plaintiff's counsel say:

"The city is indebted to the plaintiff in the sum of $20,896.86 for work actually performed and materials and plant actually used, and in the additional sum of $9,000, being the profit he would have realized had he been permitted to complete his contract, and the further sum of $2,500 that he would have made by making the necessary connections between the residences and the sewer system; making a total of $32,396.86, less $5,-450.04 paid on account. * * *

"The plaintiff rests his right to abandon his contract and demand payment for work done and profits he would have realized, on the grounds that—

"First. By the action of the city in employing engineers who, either through ignorance or design, furnished him with grades and levels so erroneous that he was put to continual extra expense, his labor disorganized, and every impediment placed in his way to prevent his successfully completing his contract.

"Second. By the city, through its officers, taking possession of his work, uncovering without cause the pipes laid in such a manner as to insure the breaking of each length of pipe as it came to view, clearly evincing their intention of 'breaking the contractor.' * * *

"The plaintiff, in his petition, alleges 'that, even with the delays and errors, your petitioner was willing and anxious, having the means at hand, to continue and complete said work.' The testimony, not only of the plaintiff, but also that elicited from every witness placed on the stand, shows that this allegation is true. It cannot be denied that in-

numerable errors were committed, which were daily costing the plaintiff sums of money to repair; and, although all his bills up to the trial of the cause had been 'turned down,' still he was in hopes that at some future day, when the work was completed, the city authorities would reimburse him. Plaintiff, for the errors and changes, could not legally, without putting himself in default, have given up the contract. The law is clear and positive that for acts done by the contractor which may be compensated in dollars and cents the contract must not be voided. The contract itself had made provision for extra work due through the faults or the errors of the city, and, though the officials were apparently determined the plaintiff should not get compensation, still the agreement was there.

"But, though these errors would not justify the voidance of the contract, they go a great way to indicate the methods adopted towards the contractor, and throw abundant light upon the acts of the city, when causes justifying avoidance of the contract were shown. The allegations of the petition show that the abandonment of the contract was not based exclusively on the errors and changes made by the city, but on more serious legal grounds."

Counsel, having made this statement in their brief, charge that the defendant, without cause, took possession of the works unlawfully, and exposed the pipes in the trench from 20 to 25 feet deep in such a manner as to insure the breaking of each piece as it came to view.

Counsel also attribute the whole of the litigation and loss to both parties to the illegal refusal of the engineer to permit work to have been done on Sunday, October 13th. They claim that the contractor had the right to work on that day, that there was no law prohibiting such work, and that there was nothing in the contract giving the city power to prohibit it.

In order to fully understand the situation of the parties to this litigation, it is necessary that certain provisions of the contract additional to those hereinbefore referred to should be stated. Under the subheading of "Excavation of Trench," the eleventh section or article of the specifications of the contract declares, among other matters, that:

"The trench shall be excavated along the line designated by the Engineer and the depth necessary for laying the sewer or sub-drain at the grade given by him. * * * · In case the trench be excavated at any place except at points below the proper grade, it shall be refilled to grade with sand or loam thoroughly rammed without extra compensation, unless the excavation be ordered by the Engineer. No tunneling will be allowed except by written permit with restrictions from the Engineer.

"The Engineer shall have the right to limit the amount of trench that shall be opened or partly opened in advance of the completed sewer, and also the amount of trench left unfilled. In soft ground or where in the opinion of the Engineer the soil is of such nature as to endanger the alignment of the sewer, the trench shall be excavated to such depth below and then brought back to grade by suitable filling of dry earth, sand or concrete, or in such manner as the Engineer may direct and for this work the contractor shall receive no extra compensation."

In the twentieth section it is declared that "earth slips and caves into the trench must be refilled and stamped in the same manner as the trench proper without extra compensation."

In the twenty-fifth section of specifications it is declared, under the subheading of "Final Inspection": "In general the work shall comply with these specifications, and if found not to be so in any respect it shall be brought to the proper conditions by cleaning pointing, or, if necessary, excavating and rebuilding all at the expense of the Contractor. But if it be found after uncovering any pipe or other work at the order of the Engineer that no defects exist or that a defect was not due to the fault of the Contractor, then the expense of it shall be borne by the City."

The twenty-sixth section of the specifications, under the subheading "General Provisions," declares that: "If any alteration in the plan directed by the Engineer diminish the quantity of the work to be done, they shall not constitute a claim for damages nor for anticipated profits, and any increase or decrease shall be paid for or deducted according to the quantity actually done, and at the price established for the work, under the contract. The work shall be prosecuted in such manner and form as at many different points at such time and with such force as the Engineer may determine from time to time, during the progress of the work. * * * Should it become necessary to restore stakes marking grades or lines destroyed or displaced through the carelessness of the Contractor or any of his employés, such restoration shall be at the expense of the contractor. If any person employed by the contractor on his work shall appear to be incompetent or disorderly, he shall be discharged immediately at the requisition of the Engineer, and shall not be employed again on the works."

The twenty-eighth section of the specifications, under the subheading of "Imperfect Work," declares that: "When any work or material is found to be imperfect whether passed upon by the Inspector or not, the said work shall be taken up and replaced by new work, without delay at any time prior to final acceptance. If the contractor shall be notified by the Engineer of any requirements or precautions neglected or omitted, or of any work improperly done, he shall at once remedy the same, and if he fail to do so, the Engineer under the direction of the City shall perform such work at the Contractor's expense and deduct all costs from amounts due or to become due by the Contractor."

The thirtieth section of the specifications, under the subheading of "Extra Work," declares that: "If any work of the general nature of the work herein contracted for, but for doing which a bid has not been specially made shall need to be done, the Contractor shall do the same under the direction of the Engineer and shall receive therefor the actual cost of labor and material used as shown by satisfactory vouchers plus ten per cent. for superintendence and use of tools, but he shall not be entitled to receive payment for any work as extra work unless ordered by the Engineer to do the same as such."

By the thirty-third specification it is declared that: "The Engineer in charge shall have the final decision of all matters in dispute, involving the character of the work, the compensation to be made therefor or any question arising under this contract. He shall, as representing the City, have the option of making any changes in the line, grade, plan, form, disposition, dimensions, quantity

or material of the work herein contemplated, either before or after construction is begun, and all other explanations or directions necessary for carrying out or completing satisfactorily the different descriptions of work contemplated and provided for under this contract will be given by the Engineer."

The thirty-fourth section declares that the contractor must perform the work contracted for strictly according to these specifications, and follow at all times without delay all orders and instructions of the engineer in the prosecution and completion of the work, and every part thereof.

By the thirty-fifth section it is provided that the engineer, on the 1st of each month, or within five days thereafter, during construction, will estimate the amount of work completed during the preceding month according to these specifications, and 85 per cent. of the amount due beyond the reservation herein made will be paid the contractor on or before the 15th of each month for the work of the preceding month.

When the contract shall have been completely performed on the part of the contractor, the engineer shall proceed to make final measurements and estimates of the same, and shall certify to the same to the city council, who shall, except for cause, herein specified, pay the contractor, on or before the fifteenth day after such completion of the contract, the balance which shall be found due, excepting such sum as may be lawfully restrained under any provision of the contract.

The plaintiff acknowledges to have received $5,450 on account, and it is declared in the judgment of the district court (though there is nothing in the record sustaining this statement beyond the statement itself) that "since the institution of the suit the plaintiff admitted other credits, aggregating about $4,500." According to this, the plaintiff has received upon the contract $9,500.

The work covered by plaintiff's contract was, beyond question, impeded during its execution by cavings in at different times of the banks of the trenches, and by alterations of the grades first given to him by the assistant engineer and his subordinates, employés of the city. These cavings and alterations carried with them, as a consequence, outlays and expenditures of money by the contractor which otherwise would not have been called for. We discover nothing, however, in the record indicating a desire or intention on the part of the engineer in charge of the work or his assistants, through their conduct, to injure the plaintiff, and force him for self-defense to abandon his contract. If the contractor has any rightful demand against the city, it must rest upon a basis other than this. We do not think that the directions given by the chief engineer to the plaintiff in regard to the work, which are complained of by the latter as having been arbitrary, furnished him any legal ground for complaint. The subject-matters thereof were placed under his control and authority by the express terms of the contract. We perceive nothing arbitrary in the exercise of the authority. The engineer claims that, to have given the plaintiff any greater latitude than he did, would have resulted prejudicially to both parties, and we are not prepared to say that this proposition is not well founded.

The alterations of grades and the cavings of banks are matters which almost necessarily occur in the execution of sewerage work. They may be occasioned by the fault of the contractor, by that of the engineer or his assistants, or by that of neither, but may result from unforeseen difficulties or unavoidable accidents. A reading of the contract will show that their possible or probable occurrence was contemplated by both of the contracting parties, and that in the event of their occurrence the rights, the obligations, and the remedies of each were precisely fixed by special clauses according to the facts of different cases. The different clauses, whether they were wise or unwise, judicious or injudicious, bound both sides. The plaintiff was well aware what his rights and his remedies were, as resulting from troubles of that character, for he presented the claims which he advanced arising therefrom for adjustment and settlement to the chief engineer, as provided for in these clauses. The district judge, in his reasons for judgment, correctly observes that plaintiff's complaints on these particular grounds were not urged by him in his pleadings as the cause for his abandonment of the work; that, on the contrary, his petition recited that "he was

willing and anxious, having the means at hand, to continue and complete his work, when, on the 16th of October, said city, through its officers and agents, actually violated the contract by appearing on the work with a body of men, and, despite the violent protests of petitioner, taking charge of said work without giving petitioner any notification, and for direct violation of the letter and spirit of the contract."

The appellant states in argument that his various claims were all "turned down" by the chief engineer, but this is not correct. A portion of them were allowed and a portion disallowed, but this was done after the abandonment by plaintiff of the work, and therefore was not the impelling or influencing cause for that act. We do not think that the action of the chief engineer on the 16th of October in sending a foreman with several men to a particular portion of the work, and having them uncover a portion of pipe which had been laid there, with a view to examine the condition of the same, and to place it in proper position, was, as claimed, a "taking charge of the work" by the city, and an ousting of himself from further prosecution of the work, as asserted by the contractor. His counsel correctly advised him on that subject after this fact had taken place. The pipe at the place referred to was improperly laid. Whether the fault for the same was that of the contractor or that of the engineers or inspectors, it necessarily had to be set right at once. The work could not be continued unless the correction should be made. It may be that the city, through its employés, was at fault in respect to the grade of this piece of pipe, and also for the breaking of the same in the act of uncovering it; but those were questions which were to be settled under and through the provisions of the contract. The fact itself remained that the pipe had to be set right, and the engineer had the unquestionable right to order this done by the contractor. The order to that effect was received by plaintiff's representative at the work (he himself being absent in New Orleans at the time), and, while he did not positively refuse to obey, he, in a written answer, laid the blame of the error upon the city, and impliedly raised an issue as to the authority of the engineer,

under the circumstances, to issue the order.

There is no doubt of the fact that this last-mentioned letter was handed to the plaintiff on his return to Baton Rouge, and that the subject-matter of the correspondence was then discussed. Plaintiff denies that he refused at that interview to obey the order, but the district judge held that under the evidence the fact of refusal was established. We have examined the testimony on the subject carefully, and we do not see how the judge could have reached any other conclusion than he did. Plaintiff, by refusing to correct the grade of the pipe, clearly placed himself in the wrong, and warranted and justified the city in making the particular correction itself. The contractor could not complain of that act as per se violating the contract, and as being an undertaking by the city to take charge itself thereafter of the further execution of the work generally in lieu and place of the plaintiff. If plaintiff finally reached the conclusion that this was the immediate legal effect of this act, he erred. The refusal by the contractor to correct the error complained of was a violation by him of his own duty. It placed the city in a position to avail itself of that fact as a ground for ousting the plaintiff from further continuance of the work; but it was for the city itself to decide whether it would avail itself of that right. It was not forced to follow that course. The plaintiff himself could not insist that it should do so, and base a legal right upon a legal fault and wrong.

The twenty-ninth section of the specifications has no bearing upon the question. The action taken by the city was not the equivalent of that called for and authorized by that section. The city engineer did not notify the contractor to discontinue his work immediately under the contract. The uncovering of the pipe and the placing of the same by the city at the proper grade left the contractor at perfect liberty to proceed with the execution of his work; but it is apparent that he had made up his mind that he could not carry out the contract under the existing terms and conditions without loss to himself. That this is so is clearly shown by the whole of his later correspondence with the city authorities. It is clear that the plaintiff had reached the conclusion that the power and authority conferred upon the chief engineer with his

consent were bound to result disastrously to himself, and that he therefore determined to proceed no further in the premises.

The city was perfectly willing that he should continue his work, urged him to do so, and offered to have the claims which he advanced adjusted and settled amicably by an expert on sewerage matters; but he declined the offer. The city was guilty of no wrong towards the plaintiff, and therefore he could not, by abandoning his contract without any fault on its part, after a mere partial execution of the same, acquire a position relative to the city superior to and more advantageous to himself than he would have held had he carried the contract to completion. He cannot make a contract which, if completed according to its exact terms and conditions, would be a disastrous one, a source of profit and emolument to himself by cutting off (so far as he was concerned) the contract at some selected stage, and by so doing force the other contracting party, through no error of its own, to complete the work through other persons with a disadvantage to itself, on the contract taken in its entirety, which it would not otherwise have suffered. The city had the right to deal with the work as a whole, and to have the work fully executed at the prices fixed in the contract taken in their entirety. The city claims that such was the result of plaintiff's actions in the premises. It contends that the amounts which it has been compelled to pay to Guild & Co. to complete the sewer, added to that which it has actually paid to the plaintiff, has forced it into an expenditure greater than that which it would have been called upon to pay to plaintiff for the entire work on the terms and conditions of the contract; that the plaintiff, under same, is legally liable to it for the difference, and in due course should be made to pay the same.

The situation of the parties towards each other, considered from this standpoint, was not attempted to be shown by the defendant, nor is the same disclosed by the record. The right to recover this alleged balance, if due, was reserved to defendant by the judgment of the district court.

The present action was prematurely brought upon the erroneous theory that the defendant had violated its contract, and that plaintiff was entitled to demand damages from the

city. He did not sue for any amount which might be due him under the contract. Plaintiff's demand, in manner and form as brought, and upon the cause of action declared upon, was definitely rejected and dismissed by the district court in the judgment appealed from.

We see no error therein, and, for the reasons herein assigned, it is hereby affirmed, with costs in both courts.