(54 South. 865.)

No. 18,089.

BLACKBURN v. LOUISIANA RY. & NAVIGATION CO.

(Nov. 28, 1910.   On Rehearing, April 10, 1911.)

*(Syllabus by the Court.)*

1. DEATH (§§ 49, 55*)—RIGHT TO SUE—PETITION—AMENDMENT.

The petition of a mother suing for damages in the right of her deceased son, alleged to have come to his death through the fault of the defendant, should negative the existence of minor children and a widow of the deceased; but it is within the discretion of the trial court in such case to allow the required allegation to be supplied by amendment, even after the submission of an exception of no cause of action.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 64–66, 69; Dec. Dig. §§ 49, 55.*]

2. TRIAL (§ 76*)—RECEPTION OF EVIDENCE—OBJECTIONS—TIME.

In such a suit where plaintiff has been allowed to testify without objection that she was married to a person whose name she gives, and is then asked, "Did you have any children by that husband," the objection "that the marriage certificate is the best evidence that she has been legally married and borne legitimate children" is irrelevant to the question, and comes too late to subserve the purpose intended.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 183–190, 237; Dec. Dig. § 76.*]

3. MASTER AND SERVANT (§ 111*)—DEATH OF SERVANT — CARS — DANGEROUS LOADING — NEGLIGENCE.

A flat car, at the moment when it was to be coupled to a box car, being so loaded with telegraph poles (and other freight), either that one of the poles extended beyond the end of the car, or was shot forward as a projectile by reason of the impact of the box car; and the loading in either case being improper and dangerous, and resulting in the crushing of the head of the brakeman, who undertook to do the coupling, between the end of the pole and the end of the box car, *held*, that the railroad company was guilty of negligence in furnishing a car so loaded to the brakeman to be coupled.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 215–217; Dec. Dig. § 111.*]

4. MASTER AND SERVANT (§ 243*)—DEATH OF SERVANT — CONTRIBUTORY NEGLIGENCE — RAILROADS—AUTOMATIC COUPLERS.

The automatic couplers used by defendant on its freight cars being uncertain in action, and not sure to couple without loss of time and effort, unless aided by the brakeman, who must go between the cars for that purpose; and defendant and its officers, whilst in a perfunctory way at times cautioning the brakeman as to the danger of going between the cars in coupling them, taking no serious steps to stop the practice, but, on the contrary, encouraging it by letting it be understood that the brakeman who does not couple promptly is likely to lose favor or position, or both, *held*, that defendant, upon whose superior intelligence and knowledge the brakeman has the right to rely, and not the brakeman, should be liable for consequences to the latter of doing what he is encouraged and expected to do, and that defendant is not released from its liability for negligence in so improperly loading a car that it causes the death of the brakeman who undertakes to couple it by any supposed or alleged contributory negligence on the part of the brakeman in going between such car and the car to which it has to be coupled, for the purpose of aiding the "automatic coupler" in doing its work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 682, 759–775; Dec. Dig. § 243.*]

*(Additional Syllabus by Editorial Staff.)*

On Rehearing.

5. DEATH (§ 95*) — DAMAGES — MENTAL AND PHYSICAL PAIN.

Deceased was killed, while attempting to couple certain cars, by his head being crushed between a box car and a telegraph pole; it being doubtful whether he was at all conscious after the impact of the car. *Held*, that the amount of inherited damages for physical and mental pain of deceased was necessarily small.

[Ed. Note.—For other cases, see Death, Dec. Dig. § 95.*]

6. DEATH (§ 99*)—DAMAGES—LOSS OF SUPPORT.

Deceased, an unmarried brakeman, was killed by defendant's negligence, and plaintiff, a colored woman, who was his mother, 65 years of age, brought suit for inherited damages for decedent's physical and mental pain and suffering, and also for loss of support and maintenance. Decedent earned $55 a month when working every day, Sundays included, and when no deduction was made for lost time. There was no proof of his contribution to plaintiff's support, except that he sent her money as he could get it, sometimes $30, sometimes $20, and sometimes not so much. *Held*, that a verdict awarding plaintiff $6,250 was excessive, and should be reduced to $1,985.50.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. § 99.*]

Appeal from Twenty-Second Judicial District Court, Parish of East Baton Rouge; H. F. Brunot, Judge.

Action by Delia A. Blackburn against the Louisiana Railway & Navigation Company.

Judgment for plaintiff, and defendant appeals. Modified and affirmed.

Wise, Randolph & Rendall and Laycock & Beale, for appellant.   Bondurant & Smith and Daspit & Heath, for appellee.

### Statement of the Case.

MONROE, J.   Plaintiff sues for damages for the death of her son, Lum Blackburn, lately a brakeman in defendant's employ, who died from injuries received whilst in the discharge of his duties, as plaintiff alleges, through defendant's negligence.   Defendant filed an exception, with its answer, to the effect that the petition failed to negative the existence of a widow and children, which exception was taken under advisement, and thereafter, with leave of the court, before action on the exception, the petition was amended by supplying the required allegation, whereupon the exception was overruled. The answer admits the death of petitioner's son as the result of the accident referred to in the petition, but alleges that it was caused by the negligence of the decedent.

The facts as we find them are as follows:

In the afternoon of June 26, 1909, there was to be a coupling made between the foremost of four box cars, which were attached in front to an engine and a standing flat car, loaded partly with sewer pipes and partly with telegraph poles; there being four of the latter, two extending lengthwise on each side of the car, with the sewer pipes lying between them.   The end of the foremost box car was some three or four feet distant from the end of the flat car when Lum Blackburn went between them to make the coupling, and gave the signal for the engine to move on, which signal was obeyed, with the result that the box and flat car came together. From the testimony as to what happened at that moment, it would seem that Blackburn effected the coupling, or had so adjusted the drawhead on the flat car as to bring it about,

128 La.—11

with his body in a stooping position, and that in raising himself in the act of withdrawing from between the cars his head was crushed between the end of one of the telegraph poles (which was projecting, or by reason of the impact of the box car was at the moment projected, beyond the end of the flat car on which it was loaded) and the end of the box car.   When first released, he moved himself about somewhat, clutched at the place where his mouth (which had been crushed off) had been, and uttered some inarticulate cries or sounds.   Whether he was at all conscious after the impact of the car would be hard to say.   Two physicians who have testified differ upon that point.   He died within 10 or 15 minutes.   Whether it was necessary or excusable for him to go between the cars in order to make the coupling is the main issue, upon which the testimony is conflicting.   Three brakemen testify that it was necessary and customary.   Six witnesses, an engineer, a flagman, three conductors, and a train despatcher, called on behalf of defendant testify to some extent to the contrary.   The facts established by the testimony, taken as a whole, we find to be as follows: The cars are equipped in these days, as required by the act of Congress, with what are intended to be automatic couplers, to be operated by a lever from the side of the car; but from hard usage, especially on freight cars, exposure to the weather, clogging with dirt and cinders, and the fact that the drawheads have a lateral play of 1½ to, say, 3½ inches it is a matter of uncertainty, when two freight cars come together, whether they will couple or not, so that, in order to be sure that the coupling will be made upon the first attempt, it is always necessary for the brakeman to go between the cars and either open the knuckle of the coupler, or adjust the coupler or drawhead of the standing car, so that it will meet that of the approaching car squarely, or do both, and we are satisfied that it is the common practice

for the brakeman to do so, to the knowledge and with the tacit approval of those in authority over them.

Crystal, a brakeman of seven years experience (part of the time in defendant's employ) says:

"To be sure you are going to make a coupling, it is necessary that you should go between them. * * * There is a lever he could open the knuckle with, but he would have to go in there to open it more; some of them fly open and some of them don't; you have to pull that lever on some of the drawheads and reach in there and pull your knuckle out. * * * Q. Why can't you set the coupling before they come together? A. You don't know how it wants to be set at the time. Q. Why don't you know? A. You can not set a knuckle before the time, so it would be sure to make; you just can't set them. I have set them, and have made them, without going in there; but I don't do it all the time, and I didn't know it was going to make. * * * I don't care how much time you got; you can't set them, before the time, so they will be sure to make. * * * I brake every day of my life; that is the only way I make a piece of bread—braking."

Being asked whether it was usual for a good railroad man to go between the cars in order to make a coupling, he answered:

"Yes, sir; to be sure you are going to make a coupling. * * *
"Q. The same man * * * testified that it was the rules of the Frisco people to warn every brakeman they employed not to go between the cars while trying to couple, and that the Frisco and the L. R. & N. were operated under the same rules. Were you ever warned by the officials of the L. R. & N. Company not to go between the cars while trying to make a coupling when you were working for them? "A. No, sir."

Bob Davis, a brakeman for 18 years, was in the same crew as the decedent at the time of the accident. Being asked:

"Now, as a brakeman, is it necessary for a brakeman to go between cars in order to be sure that he is going to make the coupling?"

He answered:

"To be sure you have to be; yes, sir. * * * The drawheads which meet to make the coupling some of them have two, three, or four inches play, and there are some that are not that far apart; you may have to shove the knuckle from you, or reach over and pull it to you, to make it, and you must go in there, unless your arms are good length. * * * Q. Have you ever made a coupling without going

between the cars? A. Yes, sir; but it is only luck that you ever do it. * * * You have to wait until these drawheads come close together and use your judgment, in order to tell whether to shove or pull them; you have to use your best judgment. Sometimes it is necessary to pull or shove them, and when they get about 15 inches apart it is necessary to shove or pull them to you."

John Blackburn has been a brakeman for 19 years. He says you are never positive that a coupling will be made with an automatic coupler, unless you go between the cars. Being asked to explain, he replied:

"Well, on raising the lever on this car you are supposed to open this knuckle. A good many times when you pull this lever the lug will come up, but the knuckle will not fall open. When that lug is up, if it is raised when you pull that lever, the knuckle will stand, and not fall open; then you will have to go in between the cars and pull it with your hands, and then it comes open. * * * A good many times cars are standing in low places; one leans one way and one the other, with both knuckles open; then you will go ahead; then both drawheads will pass each other with both knuckles open, unless you stay there and shove or pull the drawhead, to make it match. * * * They will have to be exactly straight towards one another, with one or both open."

He says he was never warned not to go between cars in order to couple them.

The testimony for the defense upon the question is in substance as follows: Montz, who has been railroading for 23 years and is a locomotive engineer, was in charge of the locomotive which pushed the box cars that were to be coupled by the decedent. He says that it is not necessary for a brakeman to go between cars in order to couple them:

"Because the coupler is automatic and supposed to make itself. They do not always couple on the first impact, and in such cases they generally go there and reset it. * * * Q. Is it possible to tell when they are going to make without being between the cars? A. No, sir, it is not. Q. Suppose one drawhead is a little bad—further to the right or left of the other drawhead—will the cars couple when they come together? A. I cannot answer that. * * * Q. Is it not necessary that one drawhead hit the other drawhead in a particular spot, in order to make the coupling? A. I don't know. Q. Would you consider a brakeman competent who required you, as an engineer, to back your train * * * three or four

times, in order to make a coupling? A. No, sir; I would not."

According to his testimony, the witness was never a brakeman, and never had any, save casual or accidental, experience in coupling cars. McCloskey was flagman in the same crew with deceased, and at the time of the accident had been railroading for about 17 months. He says that he makes couplings every day and also at night. After the accident he made a coupling about two cars ahead of those which Blackburn coupled, or attempted to couple, and he did not go between. Being asked:

"In order to make a coupling, is it necessary that a man should go between the cars at the time they come together?"

"He answered:

"No, sir; not always. Sometimes he steps in, but he does so at his own risk. * * * Q. Why is it necessary sometimes? A. The knuckle might have slipped a little to one side, or shifted some way; * * * some of them wear, so that they have some play. * * * Q. Is the brakeman absolutely sure that he will make a coupling by opening the knuckles before the cars come together and getting out before they come together? No, sir."

Lindsay, a freight conductor, has been railroading for 14 years, and served four years as brakeman. He says that with two cars equipped with "Tower" couplers, "in good order," it is not necessary or proper for the brakeman to go between in order to couple them; that standard couplers, "in good condition," will couple automatically eight times out of ten on the first impact.

Freiberger, defendant's train despatcher, says, that in his opinion it is unnecessary to go between the cars equipped with automatic couplers, in order to couple them; that he several times cautioned the decedent about doing so, telling him that it was dangerous and that he would be likely to get hurt; that (quoting his language) "I have cautioned a great many brakemen when I have noticed them following that practice of going be-

tween cars to make couplings"; but that he did not make it his business to notice them.

Aldredge, passenger conductor, has been railroading about 15 years, part of the time as freight brakeman. Being asked: "From your knowledge of the subject, is it necessary or proper for a brakeman to stay between the cars when a coupling is made?" he answered, "No, sir." He further said that, if the coupling is not made on the first impact, the brakeman should move the train up, so as to part the cars, and try it again.

Anderson was conductor of the train by which Blackburn was killed. He says that he has had experience since 1889 in coupling cars, but whether as brakeman or conductor does not appear. He had often cautioned decedent to keep from between cars in making couplings. "It is not necessary, with an automatic coupler with which all cars are coupled at this day and date."

There is testimony to the effect that the flat car upon which the telegraph pole which figures in this case was loaded was between two box cars, but we think the poles were loaded on two flat cars, making what is called a "twin load," the proper method, as it is shown, of loading poles which are longer than one car. The poles were loaded under the direction of Wilson, defendant's trackman, but it is not shown when they were loaded, and Wilson says that he does not know how many miles the cars were hauled between the time of the loading and that of the accident; and, though the load was properly put on, he does not know whether it was properly on at the time of the accident. It is shown by defendant's witnesses that, where poles project beyond the end of the car, the loading is improper and unsafe, and it is also shown that immediately after the accident the pole by which Blackburn was killed was found so projecting for a distance of 18 or 20 inches, but it is not shown, as we think, whether that condition

existed, or did not exist, immediately before the accident. The decedent was the son of the plaintiff, who was dependent on him; was about 31 years of age, and in good health, when killed, and was earning $55 a month.

### Opinion.

[1] The decedent's right of action survived in favor of his mother only in default of minor children and a widow, or either. As to that, therefore, the exception that the petition did not negative the existence of such children or widow was good, but we are of opinion that plaintiff was properly allowed to amend; the matter being within the discretion of the trial judge.

The cause of action otherwise disclosed, however, is that conferred directly on the plaintiff by the concluding paragraph of Act 120 of 1908, to wit:

"The survivors above mentioned may also recover the damages *sustained by them* by the death of the parent, or child, or husband, or wife or brothers or sisters, as the case may be."

[2] On the trial the following questions were asked plaintiff and answered by her, without objection, to wit:

"Q. Were you ever married? A. Yes, sir. Q. To whom? A. William Blackburn."

And it was only when she was asked, "Did you have any children by that husband?" that the objection was made "that the marriage certificate is the best evidence of the fact that she had been legally married and had legitimate children," which objection was irrelevant to the question propounded and came too late to subserve the purpose intended.[1]

[3] It is undisputed that the immediate cause of Blackburn's death was the crushing of his head between the end of the telegraph pole (loaded on the flat car) and the end of the box car. It is equally undisputed

[1] Having proved that she was married, plaintiff was certainly entitled to show by her own testimony that the decedent was her son by that marriage.

that the loading of a car, with the pole extending beyond the end of it, unless upon another car, thus making a twin load, is improper and dangerous. We, however, think that defendant has fairly made out that as originally loaded the offending end of the pole was within the limits of the car that was coupled (the other end extending over and resting on another flat car), but it remains a question whether it was moved beyond those limits at some time prior to the collision between the flat and the box car, or as the result of that collision. If the pole was projecting before the collision, it might very well be said that the proximate cause of the accident was Blackburn's placing himself between the two colliding objects, the end of the pole and the end of the box car. If the pole was in its proper position up to the moment of the collision, and its projection was the result of the collision, such projection would seem to have been the proximate cause of the accident, for in that case, notwithstanding his going between the cars, Blackburn would not have been killed but for the subsequent movement of the pole. From either point of view, however, we think defendant was at fault with regard to the loading of the car. Its own witnesses say that it is bad and dangerous loading to put a pole on a flat car with the end projecting beyond the limits of the car; and we have no hesitation in saying that it is worse and more dangerous to so place a pole on a flat car that, upon the impact necessary for coupling the car, or any other ordinary and to-be-expected movement, it will be shot forward or backward as a projectile. [4] The question, then, is, Has defendant been released from the consequences of its fault and negligence in furnishing a dangerously loaded car for Blackburn to couple, by any contributory negligence of his, in going between the cars for the purpose of making the coupling? We think not. There were so

many persons killed and injured in going between the cars in order to couple them that the government of the United States humanely enacted the law to the effect that cars engaged in interstate traffic should use automatic couplers, and we infer from some of the testimony in this case that, in the more expensive and better cared for equipment of passenger cars, such couplers are used effectively, and have no doubt saved many lives and much misery and distress.

On the other hand, the testimony in this case convinces us, as it appears to have convinced the 12 men constituting the jury and the judge by and before whom the case was tried, that, as applied to freight cars, the automatic coupler is only partially effective, and that the unhappy brakeman is expected to complete its work by going between the cars. From the testimony in the record, it appears to us that defendant tries to "save its face," and its officers (no doubt, by its direction), their places, by now and then giving perfunctory cautions about the danger of going between cars to couple them; but we conclude that the brakeman who should insist upon relying upon the automatic coupler, and should require the engine or train to pull off and try it again whenever the coupler failed to couple, would very soon find it necessary to seek some other means of livelihood. It may be said "that would be the proper course for him to pursue," and in many cases and under many circumstances it would be. But, if it be true, as we think it is, that the defendant company (instead of taking such steps as would be effective to put a stop to the practice), whilst indulging in perfunctory warnings, which in this case are attempted to be brought home only to a dead man, tacitly encourages brakemen to couple in the old style, with the prospect of discharge in the air if they do not, it (the company), upon whose superior intelligence and knowledge the brakemen have the right to rely, should be held liable for the consequences to the latter of their doing what they are thus encouraged and expected to do. Mr. Freiberger, defendant's train despatcher, said in his testimony:

"I have cautioned a great many brakemen, *when I have noticed them following that practice of going between cars*, to make the couplings. Q. Do you make it your business to notice when they go between cars in making couplings? A. No, sir; but *when I notice them I caution*."

From which it appears that there is such a practice known to him, and that he does not make it his business to notice it; and when he notices it he cautions. He, however, mentions the name of but one brakeman whom he ever so cautioned, and he the man who is dead; whilst the only brakemen who have testified in this case say, without contradiction, that they have never received any such caution, but, on the contrary, that if they failed to make the couplings promptly they were pretty sure to hear from the conductor or the engineer.

Thus Bob Davis (one of the three brakemen who appeared in the case) testified as follows:

"Q. You stated in your direct examination that the reason why the brakemen went between the cars was to adjust the coupling, in order to be sure to make the coupling; is there any other reason why the brakeman is compelled to go between cars? A. Yes, sir; you have to go in there to adjust the coupling, and you have to do so to please the conductor and save time. Q. If you do not go between cars, and you fail to make the coupling, what is the result? A. Well, you do not please the engineer, either the conductor; the engineer will kick, so will the conductor. Q. Has it ever happened to you? A. Yes, sir; plenty of times."

The defendant, no doubt, has many brakemen in its employ, and it might have produced some of them to testify in regard to the manner in which the coupling is done on its lines, but it did not. If there is a brakeman working for it who has ever received a notice or a caution upon the subject of going between cars, it might have produced him, but it did not, though its train despatcher and the conductor of the train to which Black-

burn was attached very readily remembered that they had warned him repeatedly. And yet in spite of those warnings, which he is not here to tell us about, he lost his life by going between two cars to couple them, as he appeared to think his duty required, though he need not have done so if the defendant, instead of letting it be understood that he would lose favor or be discharged if he did not, had done so simple a thing as to order that he should not do so under penalty of discharge.

Upon the whole we find no error in the verdict and judgment appealed from, whereby plaintiff was awarded the sum of $6,250, with legal interest from the date of the judgment, and costs, and the same are accordingly affirmed.

### On Rehearing.

PROVOSTY, J. [5] A rehearing was granted in this case on the quantum of damages. On the original hearing no stress was laid by either side on the quantum of the damages, and the court, having reached the same conclusion as the jury on the merits of the case, simply affirmed the judgment. On application for rehearing, the attention of the court was called to the fact that of the three elements of damage in cases of this kind—namely, (1) the physical and mental pain and suffering of the deceased; (2) the physical and mental pain and suffering of the plaintiff; and (3) the loss of support and maintenance—only the first and third are alleged or relied on in the petition; and that, as founded solely upon these two elements of damage, the judgment was manifestly too large.

Plaintiff alleges in her petition that the head of the decedent was "crushed to an almost unrecognizable mass," and we found as a fact that "whether he was at all conscious after the impact of the car, it would be hard to say." Under these circumstances the amount of inherited damages for the physical and mental pain and suffering of the decedent cannot be very large.

In the case of Kimbell v. Homer Compress Co., 109 La. 967, 34 South. 41, this court said:

"The boy Kimbell was instantly killed; his skull was crushed between the boiler and the brick wall. [In the instant case between the box car and end of the pole.] He did not live to suffer and then die, leaving an heritable claim to his parents on account of his sufferings."

The court allowed the parents $1,000.

In Burns v. Ruddock Cypress Co., 114 La. 247, 38 South. 157, where the young man for whose death the suit was brought had lived 24 hours after injury and had been subjected to severe pain, the allowance was $1,200.

In Clements v. La. Electric Ry. Co., 44 La. Ann. 692, 11 South. 51, 16 L. R. A. 43, 32 Am. St. Rep. 348, the court said:

"The deceased was almost instantly killed, and no damages can be awarded for sufferings."

We quote this last, not as meaning that where the death is "almost" instantaneous there is necessarily no room for suffering and damage, but merely as expressing the idea that in such cases the margin is scant, and the claim for damages more or less doubtful.

[6] Passing to a consideration of the element of damages for loss of support and maintenance, we find that the plaintiff is a colored woman 65 years old; that her son, the decedent, was earning $55 per month as a brakeman when working every day, Sundays included, and when no deduction had been made for loss of time; that there is no evidence of his having contributed to the support and maintenance of plaintiff, except the following testimony of plaintiff herself:

"How did he support you? A. He sent me money. Q. How did he send you money? A. As he could get it. Q. How much did he send you every month? A. No certain amount. Sometimes he would send me $20; sometimes $30; sometimes not so much."

Considering the well-known improvidence of the colored race, and the irregular life these colored brakemen lead, we think that upon this evidence a regular allowance of $15 per month would lean more to the side of liberality to the plaintiff than otherwise. The life expectancy of plaintiff according to the American Mortality Tables would be 11 years and 10 days. This, at the rate of $15 per month, would make $1,985.50. We have concluded to reduce the judgment to that amount. The physical and mental suffering of the decedent we consider doubtful, and therefore not such as may serve as a basis for judgment. Cases analogous to the present, and showing what allowances have heretofore been made by this court, are the following: Bland & Wife v. Ry., 48 La. Ann. 1061, 20 South. 284, 36 L. R. A. 114; Foreman v. Eagle Rice Co., 117 La. 229, 41 South. 555; Burns v. Ruddock Cypress Co., 114 La. 247, 38 South. 157; Erslew v. N. O. & N. E. R. Co., 49 La. Ann. 87–102, 21 South. 153; Clements & Wife v. Electric Co., 44 La. Ann. 698, 11 South. 51, 16 L. R. A. 43, 32 Am. St. Rep. 348.

It is therefore ordered, adjudged, and decreed that the judgment heretofore handed down in this case be reduced from $6,250, with legal interest, to $1,985.50, with legal interest from the date of the judgment of the lower court, and that as thus reduced the former decree of this court be reinstated and reaffirmed.

SOMMERVILLE, J., takes no part herein.