(60 South. 608.)

No. 19,029.

JOHNSON v. INDUSTRIAL LUMBER CO.

(Dec. 16, 1912. Rehearing Denied Jan. 20, 1913.)

*(Syllabus by the Court.)*

1. MASTER AND SERVANT (§ 259*)—INJURIES TO SERVANT—ACTIONS—PLEADING.

Where, in an action in damages for personal injuries sustained by an employé whilst in the service of his employer, the petition alleges that the accident which resulted in the injuries was caused by the gross incompetence, carelessness, and negligence of the "defendant company, its agents and employés," the plaintiff is not obliged to allege, in order to disclose a cause of action, that the agents or employés referred to were the superior officers, and not the fellow servants, of the person injured.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 837–843; Dec. Dig. § 259.*]

2. MASTER AND SERVANT (§§ 190, 216*)—INJURIES TO SERVANT—FELLOW SERVANTS—ASSUMPTION OF RISK.

Where, in an action in damages for personal injuries sustained by an employé whilst in the service of his employer, it appears that the accident which resulted in the injuries was

131 LA.—29

caused by the negligence of defendant's vice principal in failing to discharge an admitted duty essential to the safety of those working under his direction, there is no place for the application of the doctrines of "assumption of risk" or "fellow servant."

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 449–474, 567–573; Dec. Dig. §§ 190, 216.*]

3. MASTER AND SERVANT (§ 190*)—INJURIES TO SERVANT—FELLOW SERVANTS—NEGLIGENCE OF FOREMAN.

It is negligence for a skidder foreman to fail, properly and efficiently, to inspect the ground over which he intends to skid logs and to remove all standing trees which are likely to be knocked down in the process of skidding, and where, as the result of such negligence, an unsound tree is left standing in the way, and, being knocked down in the skidding of a log, falls on a rider boy and kills him, the principal—employer of the foreman and boy—is liable in damages.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 449–474; Dec. Dig. § 190.*]

*(Additional Syllabus by Editorial Staff.)*

4. MASTER AND SERVANT (§ 235*)—INJURIES TO SERVANT—CONTRIBUTORY NEGLIGENCE.

Where neither the tong setter nor skidder foreman knew that a tree was standing where it was likely to be knocked down in the process of skidding, a boy rider injured by such an accident was not guilty of contributory negligence, since he could not be expected to be better informed.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 710–722; Dec. Dig. § 235.*]

5. DEATH (§ 31*) — ACTIONS FOR CAUSING DEATH—RIGHT OF ACTION.

In default of children or widow of one whose death was caused by negligence of defendant, the right to recover for decedent's suffering falls on his parents, and where there was a judgment of separation a mensa et thoro between them, the mother is entitled to one-half of the amount which may be assessed on that account, and also to recover for the injury, moral and mental, as well as material, sustained by her as the result of the son's death.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 35–46, 48; Dec. Dig. § 31.*]

6. DEATH (§ 98*) — ACTIONS FOR CAUSING DEATH—DAMAGES.

An award of $2,326.50 to a mother to whom the custody of her son had been awarded by a judgment of separation a mensa et thoro between her and her husband, for the son's death at a time when he was rendering her

needed material assistance, should be increased to $5,000.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 124; Dec. Dig. § 98.*]

Appeal from Fifteenth Judicial District Court, Parish of Calcasieu; Winston Overton, Judge.

Action by Mrs. Mary F. Johnson against the Industrial Lumber Company. From a judgment for plaintiff, defendant appeals. Modified.

Pujo, Moss & Williamson, of Lake Charles, for appellant. John B. Kent, of Lake Charles, for appellee.

## Statement of the Case.

MONROE, J. Plaintiff's son Asa, past 16 years old, received injuries of which he died whilst in the employ of defendant, and, as she alleges, through defendant's negligence; and, having obtained a verdict and judgment for $2,326.50, she has answered defendant's appeal and prays that the award be increased. Defendant pleads the general denial, assumption of risk, contributory negligence, and negligence of fellow servant.

Asa Johnson, plaintiff's son, was employed as "rider," and his duties required him to ride upon a horse which drew behind it the end of the "skidder line" and tongs attached thereto and deliver his burden to the "tong setter," whose duty it was to attach the tongs to the log selected by him to be "pulled" and signal the "drum puller" to "pull," whereupon the "drum puller" was expected to set the drum in motion, which would have the effect of winding in the skidder line on the drum and pulling the log attached thereto by the tongs, just as the winding of a reel pulls in the fish, attached to the end of the line by the hook, to the holder of the rod. And, as the log thus moved towards the skidder, it was the duty of the rider to follow it so as to be ready, at the skidder, when the tongs should be there released, to take them and the end of the line back to the tong setter for the pulling of another log, and so on. The rider received his instructions from the tong setter, who directed him where to bring the tongs (that is to say, to what particular log) and where to place himself in order to be out of danger when, the tongs being attached to the log selected, the log should be moved from its place by the revolutions of the drum. The skidder, a heavy and powerful machine, stood upon the track of defendant's logging railroad, and was capable of handling four lines upon the same side at the same time, which, being carried into the woods and attached to the logs by means of the tongs, as stated, were then wound in upon the drums, thus bringing the logs to the track, where they were loaded upon cars. The lines were, in fact, steel cables, and the drums were operated by steam power, and, when they were put in motion, the logs to which the lines and tongs were attached and to which that power was thus applied were jerked from their places and carried in the direction of the skidder with the velocity of so many missiles from as many catapults. Upon the day of the accident here in question, the skidder with which the accident is connected was operating three lines, which were sent out, at various angles from the line of its position, into a strip of woods 250 feet wide, and, say, 1,000 feet long, and 250 feet removed from the line of the railroad upon which the skidder stood and with which the strip was parallel in its length, and no logs were being, or had been, pulled from the 250-foot strip lying between that mentioned and the railroad; it being the practice, for some reason not explained, to pull the logs from the strip farther away before pulling them from the strip nearer to the road. It can readily be understood that the business thus conducted was one fraught with no little peril to those engaged in it, since there were logs pretty constantly moving with tre-

mendous force and speed, and at different angles, in the direction of the skidder, and they were likely at any time to be deflected or caused to bound through the air by striking an intervening tree or stump, or, as happened in this instance, a log might bound from a stump and strike a tree, and, the tree being unsound, knock it down, to the imminent peril of any one within its reach in falling. It was therefore the duty of the skidder foreman, before beginning to pull logs from a particular strip of woods, carefully to inspect the ground over which they were to be pulled and to have removed therefrom all standing trees, the unsound condition of which would constitute an unnecessary element of danger; and the main issue here is whether that duty was properly discharged as a preliminary to the work which was being done when the accident here in question happened. The witnesses testify that the foreman was careful, when sober, and none of them say that he was otherwise than sober on the day of the accident, and he himself testifies that he was "entirely sober that day," and on that occasion, as always, "made inspection" and had all the trees cut down that he "thought would be likely to hurt a man, or a horse, or anything else." He was not asked, either upon his direct or his cross examination, nor did he say, whether he had ever noticed, prior to the accident, the tree which was knocked down and fell upon plaintiff's son. At the moment of the accident he was near the skidder, and, being called, he went to the spot where the injured boy was lying. Defendant's counsel asked him, "Did you see the tree that struck Asa Johnson?" to which he replied, "Yes, sir," and his testimony as to his knowledge of the tree is included in the reply so made and in the following examination, in chief and cross, to wit:

"Q. What, if anything, did it have on the side of it, near the bottom? A. According to my judgment, sir, a little cat face, as big as my hand—it was a live tree—it must have been 60 or 70 feet long; it was a green tree, clean to the bottom; a little cat face on it as big as my hand. Q. As big as your hand, about? A. Yes, sir; I suppose so, sir. I wouldn't swear exactly to it, sir. Q. Now up, say two feet from the ground, what is the diameter of that tree? A. Not over six inches, at the highest. * * * Q. State whether you consider that a dangerous tree and such a tree as should be cut down in order for the skidder to operate there. A. No, sir. Q. Why? A. Because the tree didn't look dangerous to me."

On his cross-examination:

"Q. How large did you say that cat face was? A. About the size of the palm of my hand. Q. Did you inspect it? A. I looked at the tree three or four times. Q. And you say that the cat face wasn't any longer than your hand? A. To the best of my knowledge, it was about that size."

It will thus be observed that the witness nowhere states that he ever saw the tree in question before the accident, and that when asked, "Did you inspect it?" he replied, "I looked at the tree three or four times," which appears to us to be an evasion of the question and to justify the inference that he looked at the tree only after the accident. Beyond that, several witnesses were asked—being the men connected with the skidder crew, who were interested in the matter and who would have been likely to know—whether they knew of any inspection at all by the foreman, and, without exception, they answered that they knew of none. His testimony upon that subject is therefore entirely unsupported. Again, in his examination in chief, defendant's counsel suggested to the foreman, in the form of a question, "You were not drinking that day?" to which he replied, "No," which was followed by, "You were sober that day, attending to your work?" which elicited the reply, "I was entirely sober that day."

His further examination on the subject of sobriety vel non was as follows:

"Q. You are sure that you were sober that day? A. I am, sir. Q. You weren't sober every day? (Objected to as irrelevant and im-

material.) **By the Court:** The objection is sustained."

At other times and from other witnesses, counsel for defendant sought to prove that the foreman drank or was under the influence of liquor while on duty, and the testimony was excluded. Thus in the examination of W. A. Richard, one of defendant's employés who was working under the foreman on the day of the accident, he was asked whether he knew the general reputation of the foreman "as to conservatism and carefulness as a manager," to which he replied in the affirmative. He was then asked, "What was that reputation?" to which he replied, "He was a reckless man, to my notion," and then follows:

"Q. This recklessness frequent or infrequent? A. Frequent. Q. Did you regard him as a reckless man all the time, or just at times? (Defendant urges the same objection as was previously urged. Further, that the question is leading.) By the Court: The objection that the question is leading is sustained. A. Just at times. Q. Upon what occasion? A. To the best of my knowledge, when he was drinking—drinking intoxicating drinks."

The witness was then asked whether the foreman drank while on duty, and he answered that he had never seen him do so. He was then asked whether he had ever seen the foreman under the influence of liquor while on duty, and defendant's objection to the question was sustained, with reservation to plaintiff to show, if he could, that the foreman was under the influence of liquor at the time of the accident, or the accident was brought about directly by reason of his being under the influence of liquor, "in order to show that he was incompetent at the time of the accident." We are of opinion that, upon the general question whether the foreman was the proper man for the responsible place held by him, the inquiry thus attempted should have been permitted, since it was one way, and perhaps the only way (since a man in his position would hardly do his drinking in the face of those whom he was employed, to direct and control), of finding out whether the foreman was habitually, or at any time, under the influence of intoxicating liquor whilst on duty, from which and other circumstances one might draw one's conclusions as to whether he was under such influence on the day of the accident. As to the foreman's estimates of the size of the cat face and of the tree, he is shown to have been grossly mistaken; the facts being that the cat face was 6 or 7 inches wide and from 4 to 6 feet long, and that the tree was nearer 10 or 12, than 6, inches in diameter, the piece showing part of the cat face, which has been brought up as an exhibit, measuring 13 inches. It is shown that, although the tree had green limbs on it and appeared, for the most part, to be covered with sound bark, it was dead at the top, and the evidence is conclusive to the effect that, at and about the cat face at the bottom, it was badly decayed. It is shown, too, that, whilst a cat face does not always indicate decay, the chances are about even that it does, and that any one having experience in such matters can easily tell when there is decay and when not. Our conclusion upon the point under consideration is that the skidder foreman never inspected the tree in question prior to the accident, and that, if he had done so, he would readily have discovered its condition. The circumstances immediately connected with the accident are as follows: The pulling was being done upon the east side of the railroad track and, at the time of the accident, from a point, say 300 feet, due eastward from the skidder. The rider had delivered the tongs to the tong setter, and ridden away to a point about 75 feet to the southeastward from him, where he sat upon his horse waiting for the moment when he should start back to the skidder. The tong setter attached the tongs to a log about 40 feet long, which was lying parallel to the railroad, and gave the signal to "pull," and the drum pulled, but the log

was brought sidewise against a stump at a point 4 or 5 feet from the end to which the tongs were attached. The tong setter then signaled to pull again, or pull harder, and there was another pull which jerked the log over the stump and carried it through the air a distance of 8 or 10 feet where, without having touched the ground, it struck the tree in question, which swayed and then fell backward upon the rider and his horse, fatally injuring both of them. The accident happened shortly after 3 o'clock in the afternoon, and the boy was taken to the town of Marionville for medical attention, and died there about 8 o'clock in the evening. The physician who attended him testifies that:

"One side of the head—of the bones of the skull—was depressed by a blow, and on the same side his shoulder was injured by the same cause, and also the base of the skull was fractured."

He further testifies that he reached the young man, as he guesses, about 15 or 20 minutes after the accident; that he was then unconscious and so remained until his death; and that in his opinion the young man never, at any time, experienced any suffering as the result of the accident. We are satisfied that the witness was mistaken as to the interval that elapsed between the moment of the accident and that at which he first saw the patient. The accident happened in the woods, four or five miles by rail from Marionville; the patient was first carried by hand to the railroad, a distance of, say, 100 yards, and, after some delay, was placed on one of defendant's train engines whereby he was transported into town, but the engine was delayed on the way by a log train, which obstructed the track, and it was only upon reaching town that the doctor saw him, and witnesses, other than the doctor, estimate the time which elapsed, one of them at 35 minutes, another at an hour. We are also constrained to differ with the learned physician upon the question of the condition of the injured boy before he (the physician) saw him, and will give our reason for so differing in the opinion which follows. The evidence shows that the decedent was a good boy, his mother's youngest child, and a great comfort to her; that her eldest son is married and lives in a home of his own; that the next son was working elsewhere; that the third son was away, endeavoring to get an education; that the decedent was the only "man" on the place (which is a little pine woods farm) to assist and protect his mother and sisters; and that he turned over to his mother all of his wages, amounting to $1.50 a day. It further appears that plaintiff had obtained a judgment of separation a mensa et thoro from her husband, awarding her the custody of her minor children, and that she had incurred debts which her unmarried children were trying to assist her in paying off.

## Opinion.

[1] Counsel for defendant urge their exception of "no cause of action," and argue that the allegations that the boy "was struck by a tree which was knocked down upon him through the carelessness and incompetency of said defendant company, its agents and employés," and "that he in no wise contributed to the accident by which he was injured, and from which he subsequently died, but that the same was caused by the gross incompetency, carelessness, and negligence of said defendant company, its agents or employés as aforesaid," impute no negligence to defendant, or to any agent or employé of defendant for whose acts it is responsible. This argument is based on the ruling of this court in the case of Weaver v. W. L. Goulden Logging Co., 116 La. 468, 40 South. 798, but we do not find that it is sustained by that ruling, for there plaintiff, a tong setter, alleged that he had been injured by the negligence of the drum puller, and the district court having found that, upon the face of

the petition, it appeared that the relations of the two were those of fellow workmen engaged upon the same job, and having therefore maintained an exception of no cause of action, this court affirmed that judgment, holding, in effect, that, as it otherwise appeared affirmatively that the injured plaintiff and the servant of whom he complained occupied the relation stated, the plaintiff, if he wished to make it appear that the drum puller was his superior, should have so alleged. Where, however, as in this case, the allegation is that the injury was sustained by reason of the gross incompetency, carelessness, and negligence of the defendant company, its agents and employés, the fact, if it be a fact, that the "gross incompetency," etc., was that of a fellow servant of plaintiff, rather than of the "defendant company, or some agent or employé," not so related to plaintiff, is a matter of defense. The exception was therefore properly overruled.

[2, 4] On the merits it is undisputed that the skidder foreman was in charge of the job upon which plaintiff's son was engaged when injured; that all those who were engaged upon that job worked under his orders; and that plaintiff's son worked under the orders of the tong setter, to whom he brought the tongs and skidder line, and who was the subordinate of the skidder foreman. There is therefore no place here for the "fellow servant" defense. Nor is there any place for the "assumption of risk" doctrine, since the deceased boy cannot be held to have assumed the risk that his superior officer, the vice principal and representative of the defendant, would increase the danger of the work in which he (the boy) was engaged by neglecting a duty which belonged to him. Nor yet is there any room or place for the plea of contributory negligence, since, if neither the tong setter nor the skidder foreman knew that the tree in question was unsound and likely to be knocked down in the course of the skidding operations, the boy could not have been expected to be better informed.

[3] It is undisputed that it was the duty of the skidder foreman to inspect the place upon which the boy was set to work, with a view, among other things, of ascertaining whether there were any unsound trees and of having all such trees removed; and from the fact that such a duty was imposed upon and recognized by him, it must be deduced that the matter was one of importance as involving danger to human life. Accepting, for the sake of the argument, the rather general statement of the foreman to the effect that he made an inspection upon the occasion in question, we have found as a fact that he never inspected the tree which, by reason of its unsoundness, was the cause of the death of the plaintiff's son, and that, if he had done so, he would have realized at once the necessity of having it removed. His inspection (if he made one) was therefore perfunctory, inadequate, and negligent, and the defendant is liable for the consequences.

The petition itemizes the claims asserted by plaintiff as follows: Amount claimed in right of son for physical and mental suffering sustained by him to the amount of death, $2,500; due plaintiff for sorrow and deprivation of society resulting from death of son, $4,500; pecuniary loss in deprivation of son's earnings from date of accident to that of his majority, $2,259; amount due for life insurance carried by son in defendant company, $117; funeral expenses of deceased, $30.25; medical attention to deceased $5.50—total $9,411.75. The verdict, which was affirmed by the district court, specifies the following items: Loss of earnings of deceased, $2,259; salary due deceased to date of accident, $31.75; burial expenses, $30.25; medical attention, $5.-50—total $2,326.50. The amount ($31.75)

allowed on account of salary due the deceased is remitted, in the answer to the appeal, as not having been claimed. On the other hand, plaintiff's counsel calls attention to the fact that the verdict ignores the claim made in the right of the deceased for his suffering and that made by plaintiff for her mental sufferings, and we are asked to increase the total amount of the award to $5,000. The evidence justifies the belief that neither the physical nor mental suffering of the deceased resulting from the accident was of long duration, but we are satisfied that for a time his agony was that of a person in possession of his senses, who is dying of strangulation, even though he may have felt no pain from his crushed skull and injured shoulder. Garlington, who reached him almost as soon as he fell, testifies that he was for the moment unconscious, but that he drew him back from the horse and held his head in his lap, and that he said, "Oh, me," and seemed to be in great pain. Davis, who reached him a few minutes later, says in his testimony:

"I spoke to him, but he seemed to be suffering so greatly. The blood was running in his mouth and his eyes, and it strangled him, and he could not say anything, and then they turned him over and let the blood run out of his mouth, and he looked like he wanted to speak, but he did not speak to anybody."

[5, 6] In default of children or widow, the right to recover for the suffering thus described devolves upon the parents of the deceased, and the surviving mother, between whom and the father, as we have stated, there is a judgment of separation a mensa et thoro, awarding her the custody of the children, is entitled to recover one-half of any amount which may be assessed on that account. The mother is also entitled to recover, on her own account, for the injury, moral and mental, as well as material, sustained by her as the result of her son's death; that is to say, she is entitled to

damages for the injury to her feelings resulting from the loss of her son and of the comfort and happiness which she might reasonably have looked forward to from his society and from his filial affection and offices, and is also entitled to recover for the material assistance of which she was in need and which he was rendering at the time of his death. Act No. 120 of 1908; Underwood v. Gulf Refining Co., 128 La. 986, 55 South. 641; Cherry v. Louisiana & A. R. Co., 121 La. 471, 46 South. 596, 17 L. R. A. (N. S.) 505, 126 Am. St. Rep. 323; Bourg v. Brownell-Drews Lumber Co., 120 La. 1009, 45 South. 972, 124 Am. St. Rep. 448. Considering the different elements entering into the question, which is at best a difficult one, we are of opinion that the amount of the award should be increased, as prayed for by the plaintiff. It is therefore ordered, adjudged, and decreed that the judgment be amended by increasing the amount for which defendant is condemned to $5,000, and, as thus amended, affirmed; defendant to pay all costs.