No. 3836

Second Circuit

MYERS v. GULF PUBLIC SERVICE CORP.

(January 27, 1931.   Opinion and Decree.)

S. R. Holstein, of Jena, J. W. Cassidy, of Brookhaven, Miss., and Weber Wilson, of Laurel, Miss., attorneys for plaintiff, appellee.

Theus, Grisham & Davis, of Monroe, attorneys for defendant, appellant.

McGREGOR, J. C. B. Myers and his wife, Mrs. Lola Myers, together with their children, Gordon, Hubert, Gladys and Arliue Myers, filed suit against the defendant on June 7, 1929, for the death of Lawrence Myers on January 22, 1929, by electrocution in the ice plant of the defendant in the town of Jena, LaSalle parish, state of Louisiana. The petition alleges that the decedent, Lawrence Myers, was the son of the plaintiffs, C. B. Myers and his wife, Mrs. Lola Myers, and the brother of the other plaintiffs.

It is alleged that, upon the invitation of the defendant through its agents and employees, the senior class of the Jena High

School, of which the decedent, Lawrence Myers, was a member, on the 22nd day of January, 1929, visited the ice plant of the defendant for the purpose of studying the processes used in the manufacture of artificial ice.

As the immediate cause of the death of the decedent, it is alleged that the children of the said senior class of the Jena High School, including decedent, were led and directed across and over a large tank or a collection of several small tanks filled with water, out of which blocks of ice were manufactured. That whenever the tanks of water had been frozen into ice the blocks of ice were raised or lifted by a mechanical device overhead and conveyed to other parts of the premises. This device was operated by electricity and was conveyed along a copper wire overhead about six feet and three inches, exposed and charged with electricity. That in walking across the top of these water tanks which, it is alleged, were wet and slippery, the decedent fell, and in trying to save himself from falling, reached up and caught the live copper wire and was electrocuted.

It is further alleged that there was no sort of contributory negligence on the part of the decedent, but that his death was due to the "gross carelessness and negligence" of the defendant. That the proximate cause of the said death was the failure of the defendant, its agents and employees, to warn the decedent of the danger from the exposed or live wire. It is further alleged that the current of electricity should have been turned off while the children were in the room, particularly since the plant was not in operation during the visit of the children.

Plaintiffs sued for damages in the sum of $50,000, based on the "anguish and mental suffering caused them by the loss of" decedent. A trial by jury was asked for and granted.

On June 24, 1929, an exception of: (1) misjoinder, (2) vagueness, and (3) no cause or right of action, was filed. This exception was taken up and tried and sustained as to all parties except Mr. and Mrs. C. B. Myers, and as to them it was overruled.

On December 23, 1929, C. B. Myers, one of the plaintiffs left in the suit, appeared through counsel and dismissed the suit insofar as his interests were concerned.

On February 24, 1930, the defendant filed another exception setting up:

"1. That C. B. Meyers, father of the deceased Lawrence Meyers, and husband of the plaintiff, Mrs. Lola Myers or Mrs. C. B. Meyers, having voluntarily dismissed and abandoned the suit and as the damages, if any could be recovered, would belong to the community of acquets and gains existing between plaintiff and her said husband and as her husband is head and master of said community and alone can maintain this action, the petition of the wife discloses neither right nor cause of action.

"2. Plaintiff's petition being too vague and indefinite to admit of proof or to advise the defendant of her demands, discloses no cause of action.

"3. The statute of limitation having already run and all rights of action growing out of or connected with the death of the said Lawrence Meyers being barred by the prescription of one year from the 22nd day of January, 1929, no testimony could be received or amendment allowed so as to make new parties or set up new causes of action and defendant specially pleads the prescription of one year in bar of all demands."

This exception was immediately tried and overruled.

On March 17 and 18, 1930, the case was tried by jury and verdict rendered. On March 18, 1930, after about one-third of the testimony had been taken, a supplement or amendment to the plaintiff's petition was filed and allowed. This amendment or supplement alleged that the decedent left no widow or children. The amendment was allowed over the protest of counsel for defendant.

The jury's verdict was against the defendant and assessed the damages at $1000 and judgment in favor of the plaintiff, Mrs. C. B. Myers, for this amount and the costs of the suit was accordingly signed on March 19, 1930. The defendant has perfected its suspensive appeal and the plaintiff has answered the appeal and asks that the judgment be amended by raising the amount of damages to the sum of $10,000.

EXCEPTIONS FILED BY DEFENDANT

The exception filed by the defendant on June 24, 1929, was properly sustained as to Gordon, Hubert, Gladys, and Arline Myers, and should have been sustained as to Mr. and Mrs. C. B. Myers, the father and mother of the decedent for the reason that the petition did not allege that the decedent left no widow or children. But since the exception was overruled as to Mr. and Mrs. Myers, this defect was subsequently remedied on March 18, 1930, by the filing and allowance of the amendment containing the necessary allegations, even though the date of the filing of the said amendment was more than one year after the date of the death of the decedent. The allowing of this amendment was wholly within the discretion of the trial judge.

To sustain their exception of no right or cause of action, counsel for defendant cite us to Blackburn v. La. Railway & Navigation Co., 128 La. 319, 327, 54 So. 865. This case sustains their position, but it also sustains the trial judge in allowing the plaintiff to amend his petition so as to include the necessary allegation that decedent left no widow or children.

Register et ux v. Harrell, 131 La. 983, 60 So. 638, holds the same thing and upholds the trial judge in the exercise of his discretion in REFUSING to allow the plaintiff to amend the petition. In Stearns v. Love Drilling Co., Inc., 5 La. App. 174, it was held that the plaintiff must allege the fact that no widow or minor children survive, but plaintiff was allowed to amend the petition accordingly.

We think it will be conceded that, pending the consideration of an exception of no cause or right of action by a trial judge, the plaintiff may always be allowed to file the necessary amendment to the petition to meet the objection of the exceptor, provided the trial judge exercised his discretion in so allowing the amendment. And by the same course of reason we hold that if the trial judge has WRONGFULLY overruled an exception of no cause or right of action, the plaintiff may be allowed in the discretion of the trial judge to amend his petition to meet the objection of the exceptor, and this may even be done after the prescriptive period, provided, however, that in this event the amendment does not change the issue and does not allege a NEW cause of action.

The exception of no cause or right of action filed on February 24, 1930, should have been sustained as to Mrs. C. B. Myers, the only plaintiff left in the case, for

the reason that up to that time the petition contained no allegation that the decedent left no widow or minor children, but since it was overruled, the filing of the amendment to the petition setting forth the necessary allegations remedied the defect and caused the petition as amended to set forth a complete right and cause of action.

In this exception of February 24, 1930, counsel for defendant contend that, since plaintiff C. B. Myers had dismissed and abandoned the suit for himself, the damages, if any could be recovered, would belong to the community of acquets and gains existing between plaintiff and her said husband, that plaintiff, mother of decedent, had no right to prosecute this suit and stand in judgment. We do not agree with this contention. Article 2315 of the Revised Civil Code gives this right of action to "the surviving father and mother or either of them." (Boldface type ours.) Under the plain wording of the Code either C. B. Myers or his wife could have brought this suit alone in the first instance. This being true, after the two of them had brought it jointly the dimissal of his interest by the father does not prevent the mother remaining and prosecuting her suit in her own name and in her own right. In Robertson et ux v. Town of Jennings, 128 La. 795, p. 803, 55 So. 375-378, Justice Monroe said:

"Beyond that they each had the right of action which they are asserting, and which is conferred upon them directly by the statute, and the husband had, moreover, the right of action which as master of the community he possessed before the statute in question (or Act No. 71, of 1884, which, preceded it) was adopted, for the recovery of the expense to which the community was subjected by reason of the injury inflicted upon, and death of, the child."

And, to make the opinion stronger and to leave no doubt as to the right of the mother to sue for the death of her child the court in writing its own syllabus of this case, in paragraph 3 said:

"The right of action conferred upon a married woman by Act No. 68 of 1902, p. 95, for the recovery of damages resulting from personal injuries, includes the right to recover for injuries to feelings as well as physical injuries. Hence a married woman, whose child loses its life through the fault of another, may recover by herself alone for mental suffering caused by such death, and the amount which she may recover becomes her separate property."

In the case of Vincent et ux v. Morgan's La. & Tex. R. R. & S. S. Co., 140 La. 1027, 74 So. 541, the matter of the right of the surviving mother to obtain judgment for damages in addition to what the father may obtain in the same suit is thoroughly discussed. In the closing paragraph of this case on page 1051 of 140 La., 74 So. 514, 549, Chief Justice Monroe said:

"In the case of Parker v. Crowell & Spencer Lumber Co., 115 La. 463, 39 South. 445, a father was allowed $5,000 for the loss of a minor son. In Johnson v. Industrial Lumber Co., 131 La. 897, 60 South. 608, an award of $2,326.50 in favor of a mother for the death of a minor son, of whom she had been given the custody by a judgment of separation a mensa et thoro, was increased by this court to $5000.
"In this case the father and mother have united in the suit, and the judgment of $10,000 in their favor follows the precedents established in the two cases thus mentioned."

This clearly indicates to our minds that the father and mother each had a right of action for the death of their son. When that case was tried the mother could not have prosecuted her suit separately for

her interest, but under Act No. 283 of 1928 the wife has full power to prosecute any and all suits that relate to her rights of action.

Counsel for defendant contend that any damages if recovered in this case would fall into the community and that therefore the husband and father must prosecute the suit in any event. They cite us to and rely upon article 2402 of the Revised Civil Code. This does not bear up their contention. It must be remembered that Civil Code art. 2402 as it now reads was passed in 1902 and that C. C. art. 2315 as it now reads was passed in 1908 and in 1918. This being true, we take it that this article is authority for holding that the direct action of the surviving mother for the death of her son who died without leaving a widow or children is her separate property and, under Act No. 283 of 1928, she has a right to prosecute this action without the intervention or assistance of her husband. This article 2315 of the Revised Civil Code primarily says that the father and mother or either of them may recover damages sustained by them by the death of the child. The irresistible conclusion which must be reached, therefore, is that the mother has a separate right of action if she chooses to exercise it and under Act No. 283 of 1928, she has a perfect right to do so without the intervention or assistance of her husband.

Counsel for defendant contend in their brief that this suit was brought "under Article 2315 of the Civil Code as amended by Act 159 of 1918, which provides that the right of action 'shall survive in case of death in favor of the children or surviving spouse of the deceased, or either of them, and in default of these in favor of the surviving father and mother or either

of them.'" In this they are in error, for we hold just as was held in the case of Robertson v. Town of Jennings, 128 La. on page 803, 55 So. 375-378:

"In the instant case the right of action of plaintiff's child survived in their favor as a common inheritance, but they are not here asserting that right. Beyond that they each had the right of action which they are asserting and which is conferred upon them directly by the statute, and the husband had, moreover, the right of action which as master of the community he possessed before the statute in question (or Act No. 71, of 1884, which preceded it) was adopted, for the recovery of the expense to which the community was subjected by reason of the injury inflicted upon, and death of, the child."

Counsel for defendant urge that the amendment to plaintiff's petition filed on March 18, 1930, should not have been allowed for the reason that it alleged a new cause of action. The amendment did not change, add to or modify in any way the "Cause of Action" as set forth in the original petition. It merely set forth the fact that gave the plaintiff her "Right of Action." The allowance of this amendment was wholly within the discretion of the trial judge and we would not be justified in disturbing his ruling in this instance. The amendment simply set forth the status of the plaintiff more clearly. It did not change it in any way.

## PLEA OF PRESCRIPTION

In their exception filed on February 24, 1930, counsel for defendant included a plea of prescription contending that since the withdrawal of C. B. Myers as one of the plaintiffs removed from the suit the only plaintiff who would be authorized to prosecute the suit, and since more than twelve months had then elapsed since the

injuries on account of which this suit was brought, all right of action on the part of anyone had prescribed and that the suit should, therefore, be dismissed at once. This plea of prescription was properly overruled for the reason that we have already held that the wife had the right to prosecute the suit in her own name and therefore no prescription will apply to her right to remain in the suit.

On March 18, 1930, after the trial had been going on for one day, the plaintiff filed her amendment setting forth the fact that the decedent left no surviving spouse or minor children. Counsel for defendant objected to the filing of said amendment for the reason that it came too late and that it changed the issue, and for the further reason that it was barred by the prescription of one year and requiring service on the defendant. We think the amendment was properly allowed and that the objection and plea of prescription was properly overruled.

In Winsor v. Taylor, 167 La. 169, and on page 181, 118 So. 876-881, Chief Justice O'Niell said:

"Lanis v. Illinois Central Railroad Co., 140 La. 1, 72 So. 788, is authority for the corrollary, or converse of the proposition applicable to this case. In that case, the plaintiff, in her individual capacity, brought suit under the Federal Employers' Liability Act (Act of April 22, 1908, c. 149, 35 Stat. 65; U. S. Comp. St. sections 8657-8665 [45 USCA sections 51-59]), for compensation for the death of her husband. The statute gives such a right of action only to the personal representative of the deceased employee; and the sixth section declares that no action shall be maintained under the statute unless it is commenced within two years from the day the cause of action accrued. The suit of the widow individually was commenced within the two years, but was met with an exception of no right of action,

which was sustained; but, under authority of the decision in Missouri, Kansas & Texas Railroad Co. v. Wulf, 226 U. S. 570, 33 S. Ct. 135, 57 L. Ed. 355, Ann. Cas. 1914B, 134, the plaintiff was allowed to qualify as administratrix of the succession of her husband, and to amend her petition by appearing as personal representative of the deceased. She qualified as administratrix and filed the amended petition, appearing for the first time as personal representative of the deceased, after the two years had elapsed. The defendant pleaded the prescription of two years, but the court overruled the plea, maintaining under authority of M., K. & T. R. Co. v. Wulf, that the bringing of the suit by the widow in her individual capacity prevented the application of the statute of limitations, because the amending of the petition so as to bring the suit in the name of the administratrix and personal representative of the deceased was not the bringing of a new suit. And so we maintain in this case that the amending of he plaintiff's petition so as to make the Third District Land Company a party defendant was not the bringing of a new suit."

In the case of Lanis v. Illinois Central Railroad Co., which Chief Justice O'Niell cites in the above case, the plaintiff wrongfully brought the suit in her own name. On exception of the defendant it was held that she had no right to appear, but she was allowed to change her status and capacity by qualifying as administratrix. After this she amended her petition and set forth her new status and capacity after the prescriptive period and it was allowed over the protest of the defendant and in face of the plea of prescription which was overruled. If the plea of prescription was overruled in that case, it certainly should be overruled in the present case, for there has been no change of the status or capacity of Mrs. Myers, the plaintiff herein. The amendment simply alleges what was already true, that is. that the decedent left no surviving spouse or chil-

dren, whereas in the Lanis v. I. C. Ry. case the plaintiff was permitted to change her status or capacity and then to amend her petition accordingly after the prescriptive period. The plea of prescription was properly overruled, therefore, by the trial judge, and we likewise overrule it as filed and as renewed in this court.

## ON THE MERITS

In her petition the plaintiff alleges in effect that her deceased son was an "invitee" and that the defendant owed him the care usually extended to invitees under the law. The defendant, in its answer, in article 10 alleges as follows:

"Defendant avers that the presence of the deceased was at the request of himself and his teacher solely and for the benefit of said deceased, and in addition to the warning given, the danger was apparent, and there being no hidden defects in defendant's plant or machinery or wires, and the deceased being simply a licensee by request, under no condition could defendant be liable in damages for any injuries received, as he took the premises as found, free from any warranty on the part of defendant."

It is therefore seen that the decision of this case on its merits depends upon the question whether the defendant was an "invitee" or a "licensee." The plaintiff alleges that her son was an invitee. The first witness called by the plaintiff was J. Pipes, principal of the Jena High School. He testified that on January 22, 1929, he called Joe Davis, manger of the defendant's ice plant in Jena, over the telephone. Pipes testified:

"I asked Mr. Davis if he was making ice that day and he said they were, and I said, 'Mr. Wade wants to bring his chemistry class down there, what about it?' He said, 'All right, tell them to come ahead.' "

This was in the forenoon and the request for permission to bring the chemistry class to visit the ice plant was made for the afternoon of the same day. In the course of his testimony, Pipes answered as follows:

"Q. You made that request of Mr. Davis for the benefit of the high school class?

"A. Yes, sir.

"Q. They were not there on business for the Gulf Public Service Corporation?

"A. No, sir.

"Q. As I understand it was the chemistry class taken down there for their benefit and not for the services of this company?

"A. Yes, sir.

"Q. That was at your request. It wasn't suggested by Mr. Davis?

"A. No, sir.

"Q. He didn't invite you to bring them down there?

"A. No, sir.

"Q. As I understand it this young man was reasonably well developed both physically and mentally?

"A. Yes, sir.

"Q. Approximately about nineteen years old?

"A. Yes, sir, about nineteen the way we figured it.

    *    *    *    *    *    *

"Q. Mr. Pipes, had you made any agreement or had you known of any agreement made with the manager of the ice plant by which there was a standing invitation to bring the class of students down there?

"A. No, sir.

"Q. If there was such an agreement you didn't know of it?

"A. I ought to have known it if there had been. I should have known it. I always get permission every time.

"Q. You don't know whether the manager of the ice plant had this class down there for advertising purposes or not?

"A. I don't think he did.

"Q. You don't know whether it was for advertising purposes of the defendant or not?

"A. No, sir, I don't."

Mr. D. C. Wade, teacher of the class in chemistry, who was in charge of the students during the visit to the ice plant, testified as follows:

"Q. It is a fact that these classes were taken to this ice plant on the request of the school authorities, you and others in charge of those classes, for the purpose of the class work in their chemistry studies?

"A. Yes, sir, I got permission both times, and the purpose was to let them see how ammonia was used in making ice.

"Q. You knew that plant was operated by electricity at that time, didn't you?

"A. Yes, sir."

It is not necessary to quote further from the testimony to show that the decedent and all the rest of the members of the chemistry class visited the ice plant on this occasion solely for the purpose of observing the processes used in the manufacture of ice, particularly with reference to the use of ammonia. The visit was in no sense or degree for the interest or benefit of the defendant, nor was it made at the suggestion of the defendant or any of its employees. The request for the permission to make the visit of observation came from the chemistry class and its members as represented by the teacher of the class and the principal of the high school. There was no common interest or mutual advantage. The benefits to be derived from the visit were educational and were to inure solely and strictly to the benefit of the visiting members of the class, and in no way directly or indirectly, did the defendant benefit by it. It was a pure accommodation and inconvenience on the part of the defendant and its employees.

2 Words & Phrases, second series, 1192 and 1193, in distinguishing between an invitee and a licensee, and between the duty of the owner in each case, sets forth the law very clearly as follows:

"As respects the question whether a person is on premises as a licensee or by invitation, ' "invitation" is inferred where there is a common interest or mutual advantage, while license is inferred where the object is the mere pleasure or benefit of the person using it.' Southern Ry Co. in Kentucky v. Goddard, 89 S.W. 675, 676, 121 Ky. 567, 12 Ann. Cas. 116 (quoting and adopting distinction stated in 1 Whart. Neg. sec. 349).

" 'Invitation' is a term whose legal import is known and may be used to express the relation between an owner or occupier of land, and one who comes thereon under certain circumstances. The invitation which creates such relation may be express, as when the owner or occupier of lands by words invites another to come on it, or make use of it, or something thereon, or it may be implied as when such owner of occupier by acts or conduct leads another to believe the land or something thereon was intended to be used as he uses them, and that such use is not only acquiesced in by the owner or occupier, but is in accordance with the intention or design for which the way or place or thing was adapted and prepared or allowed to be used. There is a clear distinction between a "license" and an "invitation" to enter premises, and an equally clear distinction as to the duty of an owner in the two cases. An owner owes to a licensee no duty as to the condition of premises, unless imposed by statute, save that he should not knowingly let him run upon a hidden peril, or willfully cause him harm; while to one invited he is under obligation for reasonable security for the purposes of the invitation. Mere permission to enter the premises creates the relation of licensee; invitation, expressed or implied, is necessary to create the more responsible relation, and the consequent higher duty upon the owner or proprietor. Mandeville Mills v. Dale, 58 S. E. 1060-1062, 2 Ga. App. 607 (quoting and adopting definition in Sweeny v.

Old Colony & N. R. Co., 10 Allen (92 Mass.) 368, 87 Am. Dec. 644; Turess v. New York, S. & W. R. Co., 40 A. 614, 61 N. J. Law, 314; Beehler v. Daniels, 18 R. I. 563, 565, 29 A. 6, 27 L. R. A. 512, 49 Am. St. Rep 790). * * *

"An implied 'invitation' to use dangerous premises, as distinguished from a mere license, arises when a benefit accrues to the owner from such use, or when the use is in the interest of both parties, or is connected with the owner's business. Cleveland, C., C. & St. L. Ry. Co. v. Powers, 88 N. E. 1073, 1077 [89 N. E. 485], 173 Ind. 105 (citing Northwestern El. R. Co. v. O'Malley, 107 Ill. App. 599; Plummer v. Dill, 31 N. E. 128, 156 Mass. 426, 32 Am. St. Rep. 463; Dixon v. Swift, 56 A. 761, 98 Me. 207; 29 Cyc. p. 454)."

4 Words and Phrases, third series, pages 526 and 527, defines and distinguishes between an "invitee" and a "licensee" as follows:

"To constitute one person an 'invitee' of another, there must be some mutuality of interest. Petree v. Davison-Paxon-Stokes Co., 118 S. E. 697, 698, 30 Ga. App. 490.

"'An invitation of the owner or occupant of premises is implied by law where the person goes on the premises for the benefit, real or supposed, of the owner or occupant, or in a matter of mutual interest, or in the usual course of business, or for the performance of some duty.' Middleton v. Ross, 213 F. 6 (2), 10, 129 C. C. A. 622. To constitute such an 'invitee,' however, there must be some mutuality of interest. Crossgrove v. Atlantic Coast Line R. Co., 118 S. E. 694, 695, 30 Ga. App. 462.

"To give a person entering private grounds the standing of an 'invitee,' it must appear that his purpose when he entered the premises was one of interest or advantage to the owner or occupant; knowledge, consent, or permission even, standing alone not amounting to an invitation. Coburn v. Village of Swanton, 109 A. 854, 856, 94 Vt. 168. * * *

"The distinction between a 'licensee' and an 'invitee' upon a railroad track is not merely one of descriptive phraseology, an invitation being inferred where there is a common interest or mutual advantage, while a license is implied where the object is the pleasure, convenience, or the benefit of the person enjoying the privilege. Jonosky v. Northern Pac. Ry. Co., Am. St. Rep. 790.) * * *

"In differentiating between 'invitees' and 'licensees' an invitation is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using it. Midland Valley R. Co. v. Littlejohn, 143 P. 1, 2, 44 Okl. 8.

"One on premises by invitation, express or implied, is an 'invitee,' whereas one who is there merely by permission or toleration is mere 'licensee,' and, as to the former, owner of premises must use reasonable care, whereas to latter he owes no greater duty than to avoid willful or wanton injury. Lange v. St. Johns Lumber Co., 237 P. 696, 698, 115 Or. 337."

From the testimony quoted above, together with the citations defining and differentiating between the terms "invitee" and "licensee," the decedent clearly occupied the position of a licensee. It remains, therefore, to determine whether the defendant and its employees discharged their full duty and obligation to the decedent as a licensee.

As stated in 1 Wharton, Neg., section 349:

"An owner owes to a licensee no duty as to the condition of premises unless imposed by the statute, saving that he should not knowingly let him run upon a hidden peril, or willfully cause him harm."

Did the defendant or any of its employees let the decedent run upon a hidden peril, or did they willfully cause him harm? No one knows how this young man, a member of the graduating class of the Jena High School, nineteen and one-half years old, happened to reach up over his head and grasp this live wire. In the

petition it is alleged that he was walking over a slippery surface, and being in the act of falling, reached up and caught the wire to save himself from falling; but there is no evidence to the effect that the floor or any part over which the students were walking was slippery. On the contrary, it is in evidence that the tops of the water tanks or ice containers over which decedent was walking when the fatal accident occurred had been specially mopped and dried for the occasion of this visit. In plaintiff's petition it is alleged that the "approximate cause of his death was the failure of the said Gulf Public Service Corporation, its agents and employees, to warn petitioner's said son of the exposed high voltage live wire in said room and of the dangerous condition therein."

Did the employee of the defendant, who led or directed these students, give the directions and warnings required in the case of licensee? Did he knowingly lead these students, particularly the decedent, upon a hidden peril? This live wire was not hidden. It was overhead six feet and three inches above the level of the floor. It was in plain view of every one and out of ordinary reach. The decedent was a young man practically grown. He was possessed at least of ordinary intelligence. He knew, or should have known, that this ice plant was operated by electricity. This was a matter of common knowledge. As a "bare licensee" he was required under the law to take these premises as he found them. He was there on a tour of observation for educational purposes. He should have observed this wire without having it called especially to his attention and having observed it, he should have instantly known the danger of touching it. He evidently knew its danger without being warned. It is more likely that he touched the wire and grasped it involuntarily as one of the girl students testified she started to do, and was prevented by one of her classmates. It would appear, therefore, that the defendant's employee did not lead decedent upon a hidden peril.

But what did this employee do to warn these students concerning this wire? On the trial of the case plaintiff used nine witnesses. Three of these testified that a warning was given as to the danger from the wire. The defendant used six witnesses and they all say that warnings were especially given, so that nine out of fifteen witnesses in the case testify positively that warnings were given. The employee who acted as a guide on this occasion stated that he gave two separate, special warnings to the entire group of students, then at another time, when he came very near coming in contact with this live wire himself, accidentally, he issued another general warning. In this he is corroborated by two of the students, Misses Lois King and Irma Lee Stone. So we think it is conclusively established by the testimony that the employees who conducted this class of students through the factory gave at least three general warnings to them in a group. Whether these warnings reached absolutely every student, and particularly the decedent, we are unable to determine. But it is most likely that several did not hear it as at least six witnesses testified they did not. But it is certain that every student could have received these warnings if they had been attending to the leadership of the employee. It must be taken into consideration that these were high school seniors. They were supposed to possess a high degree of intelligence and every one of them should have known better than to grasp any kind of wire in this building.

Furthermore, it must be remembered that these students came to this ice factory under the care and direction of the teacher of the class, and the defendant's employee had a right to suppose that they would remain under his guidance and direction during the entire visit.

.We therefore conclude that the employee of the defendant did not knowingly lead the decedent upon a hidden peril and that he did not willfully cause him harm. It appears further that the employee discharged his full duty to this class in issuing the warnings which he undoubtedly did. The failure of the decedent either to heed these warnings if heard, or, if not, to hear them or any of them, is not to be charged to the defendant. It was a deplorable tragedy but because it was does not cast blame upon the defendant.

We have been unable to find a case in our own state that is directly in point, but there are cases in the other states very similar to the one at bar. Among the leading ones that involve the identical issue and circumstances as exist in the present case is Benson v. Baltimore Traction Co., 77 Md. 535, 26 A. 973, 974, 20 L. R. A. 714, 39 Am. St. Rep. 436. In this case the principal of the Baltimore Manual Training School addressed a note to the president of the Baltimore Traction Company asking for permission to the graduating class of this school to visit the plant or power house of the defendant. Permission to do so was written by the president at the bottom of the note. In this case it was alleged that the injured student, plaintiff in the case, was, "with thirty-odd other scholars and the teachers thereof, granted special written permission by the defendant company to visit a certain power house * * * for the purpose of viewing and examining the works and machinery therein contained." Upon the presentation of the written permission of the president of the defendant company, the students were admitted and taken in charge by the defendant's agents and employees. They were shown throughout the plant. It is alleged that during this visit, after the guide had left them to themselves, plaintiff, without warning or means of preventing it, fell into a vat or sink some two or two and one-half feet deep, full of boiling water, which vat or sink was flush or even with the floor, uncovered or open, and situated in a part of the building insufficiently lighted. Suit was brought for damages sustained by the negligence of the defendant. A demurrer, or exception of no cause of action, was filed by the defendant and this was sustained by the trial court. An appeal was taken to the Maryland Court of Appeals and the action of the lower court was sustained. In the course of a well-considered opinion the court said:

"It has been earnestly contended that by the admission of the appellant to the power house in the manner stated a duty was thereby imposed upon the appellee to guard the appellant from the dangers of said vat 'by warning him of its existence, or by covering the same, so as to make his passage through said premises reasonably safe.' In this we do not concur. The vat was apparently a part of the useful appliances connected with the purposes for which the power house was constructed, and was in no proper sense a mantrap.

"The appellee was under no obligation to take one of his employees from his

work to conduct the appellant and his schoolmates and their teachers through the power house; nor was the appellee required to make alterations in the manner in which it was accustomed to conduct its business, in order that these young men might go through the building. They were under the control and direction of the teachers who accompanied them, and the appellee might have reasonably inferred that they were sufficiently cared for. Even though the guide had continued with the class, there was no reasonable guaranty that one of these 30 boys would not have fallen into the selfsame vat. The principal of the school had, doubtless, some conception of the character of the machinery and appliances contained in the power house, otherwise he would scarcely have sought admission; and, if there was negligence anywhere, it consisted in bringing thirty-odd boys at one time to a building filled with dangerous machinery."

Another strong case analogous to the one under consideration is Weaver v. Carnegie Steel Company, 223 Pa. 238, 72 A. 552, 21 L. R. A. (N. S.) 466. In this case the plaintiff was one of more than two hundred men who visited the plant of the defendant. In going about over the plant, plaintiff fell through an opening in the floor which was used for the purpose of removing rubbish that accumulated from time to time in the cellar below. Plaintiff did not notice this opening in the floor and fell through it into the cellar, and in doing so was seriously injured. The plaintiff brought suit for damages on account of the injuries and the trial judge directed a verdict for the defendant. On appeal this action of the lower court was sustained. In affirming this judgment the Pennsylvania Supreme Court said:

"Counsel for appellant contends in his argument that the defendant company, having granted permission to visit its works, and furnished a guide, was under the implied duty of warning and guarding the plaintiff against the danger of falling into the particular opening in the floor into which he walked. A steel mill is by no means a place of public entertainment. If visitors go there to gratify their curiosity in seeing the process of manufacture, they must take the premises as they find them. In Gillis v. Pennsylvania R. Co., 59 Pa. 129, 98 Am. Dec. 317, this court held that a person using the private property of another by permission of sufferance takes upon himself the incidental risk. And this doctrine has been many times reiterated as was done with emphasis in Thompson v. Baltimore & O. R. Co., 218 Pa. 444, 19 L. R. A. (N. S.) 1162, 120 Am. St. Rep. 897, 67 A. 768, 11 Ann. Cas. 894. In the present case permission was sought and obtained in behalf of the body of gentlemen who were visiting the mill. The object of the visit was to afford pleasure and benefit to the visitors; so that the facts show merely a case of license upon the part of the owner. There is nothing in the record to show that appellant was invited or induced by any act of the defendant to visit the steel mill, but it does appear that he went there entirely for his own personal gratification. The authorities are almost uniformly to the effect that licensees and guests assume the ordinary risk of getting hurt while upon the premises of the licensor or host. But they do not assume extraordinary risk, such as would arise from anything in the nature of a concealed trap. In this case the opening into the cellar was part of the apparatus arranged for the convenient and proper operation of the mill, and was in no sense a trap or an obstruction to anyone making good use of his senses. The guide could not reasonably be expected to give close individual attention to each one of the 200 or more visitors who were following him. He could show the way, but something had to be left to the good sense of the visitors in following through a somewhat dangerous course."

Still another case which sustains us in the conclusion we have reached is Roe v. St. Louis Independent Packing Co., 203 Mo. App. 11, 217 S. W. 335, 336. This is a

case where a class of sixty-one boys of about fifteen years of age visited the ice plant of the defendant after special permission had been granted at the request of the instructor who had the boys in charge. The plaintiff, one of the number, fell into a vat of boiling water and brought this suit for the resulting damages. On the trial of the case the instructor testified as follows:

"'I did not go over there, nor did any of these boys go over to this plant for any benefit or profit in any way to the St. Louis Independent Packing Company. It was solely for the purpose of the education of the boys. The company did not derive any profit from it at all.'

"Plaintiff himself testified:

"'I went to this plant with a group of boys from the Young Men's Christian Association for my own curiosity and benefit. I did not go for any business of the Independent Packing Company. Arrangements were made for me to go. I did not go there to buy anything or do any work for them.'"

The trial judge directed a verdict in favor of the defendant, and in sustaining this action the St. Louis Court of Appeal said:

"The Benson Case (77 Md. 535, 26 A. 973, 20 L. R. A. 714, 39 Am. St. Rep. 436), supra, is cited with approval in Barry v. Cemetery Ass'n, 106 Mo. App. 358, 80 S. W. 709, and it likewise meets with our approval. By no reasonable inference, from the facts as they appear in the record before us, could the defendant be viewed as having sought to entice, lure, or induce plaintiff to visit the plant in question. Packing plants such as that conducted by the defendant can in no wise be viewed as places of public entertainment, and those who obtain permission, out of curiosity or desire to instruct themselves as to the processes of manufacture, to visit such plants must take the premises as they find them. They are bare licen-

sees, and enjoy such license with its concomitant perils and subject to the risk of pitfalls ' or other obstructions incident thereto, 'the owner being liable only for concealed spring guns, or other hidden traps * * * put out to injure them or any form of willful, illegal force used towards them.' Kelly v. Benas, 217 Mo. 1, 116 S. W. 557, 20 L. R. A. (N. S.) 903; Glaser v. Rothschild, 221 Mo. 180, 120 S. W. 1, 22 L. R. A. (N. S.) 1045, 17 Ann. Cas. 576; and cases therein cited."

In Poling v. Ohio River R. Co., 38 W. Va. 645, 18 S. E. 782, 787, 24 L. R. A. 215, 223, the West Virginia Supreme Court said:

"A mere sightseeer, on no other business goes into any one of the large modern factories in operation throughout the civilized world. It requires great care and watchfulness on his part, unfamiliar as he is with such places and things, to avoid danger and escape injury, although the place is reasonably safe and fit, and everything is carried on with due ordinary care; but unless there is wanton injury, the result of gross negligence, the owner is not liable. Why? The owner has set no trap for him; he did not induce, but only permitted, him to come; he is not there on business; the place and appliances belong to the manufacturing company; it was fixed for them and their employees; it suits them; by their knowledge and skill they avoid danger, though to those unskilled and unfamiliar it may be dangerous—dangerous to any one in fact; but it was not made for, and is not carried on for, any purpose with which the licensee has anything to do; if the injury is not wanton, the negligence is not gross, and the company is not liable, for it owed him no other duty, and that one has not been violated."

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be avoided and reversed, and plaintiff's demands refused and her suit dismissed; the plaintiff to pay the costs of both courts.